Reuven L. Cohen (CA Bar No. 231915)
Email: rcohen@cohen-williams.com
Kathleen M. Erskine (Bar No. 223218)
Email: kerskine@cohen-williams.com
Talia Nissimyan (CA Bar No. 307576)
Email: tnissimyan@cohen-williams.com
Michael J. Fisher (CA Bar No. 354524)
Email: mfisher@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

Alyza D. Lewin (*admitted pro hac vice*)
Email: alewin@brandeiscenter.com
THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW
1717 Pennsylvania Avenue NW, Ste. 1025
Washington, DC 20006
Telephone: 202-559-9296

*Attorneys for Plaintiff Dr. Shay Laps*
*(additional attorneys appear on signature block)*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. SHAY LAPS,<br><br>   Plaintiff,<br><br>   v.<br><br>THE LELAND STANFORD JUNIOR UNIVERSITY; DANNY HUNG-CHIEH CHOU, Associate Professor of Pediatrics, in his official and personal capacities,<br><br>   Defendants. | Case No. 5:25-cv-05767-SVK<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. Title VI Discrimination<br>2. Title VI Retaliation<br>3. Title VII Discrimination<br>4. Title VII Retaliation<br>5. 42 U.S.C. § 1981 Discrimination<br>6. 42 U.S.C. § 1981 Retaliation<br>7. Unruh Act Discrimination<br>8. FEHA Discrimination<br>9. FEHA Harassment/Hostile Environment<br>10. FEHA Retaliation<br>11. FEHA Failure to Prevent<br>12. Defamation<br>13. Unlawful Business Practice<br>14. Cal. Educ. Code § 66270 Discrimination<br>15. Failure to Pay All Wages<br>16. Constructive Discharge<br>17. Breach of Implied Contract<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.      Something is rotten at Leland Stanford Junior University ("Stanford"). And Stanford knows it.

2.      Dr. Shay Laps, an accomplished chemist, came to Stanford in the spring of 2024 for a postdoctoral appointment to develop "smart," bodily-responsive insulin that could revolutionize diabetes treatment worldwide. The goal was ambitious, but a perfect fit for Dr. Danny Chou's Stanford lab. And Dr. Laps was well positioned, having risen through the ranks of prestigious institutions and garnered the support of elite chemists, including a Nobel laureate, who regarded him as a brilliant and promising young scientist.

3.      But Dr. Laps was from Israel. And he had been admitted to Stanford, and hand selected by Dr. Chou, *before* October 7, 2023 and the subsequent upheaval on American college campuses.

4.      October 7 was a match to tinder at Stanford. Stanford knew that it had a problem with antisemitism; in 2022, it had apologized for deliberately excluding Jews. After October 7, incessant demonization and vilification of Israelis and Jews on campus was inescapable. On October 10, a lecturer told freshmen that the massive terror attack was "justified," directed Jews to raise their hands, picked one out, snatched away his chair and belongings, and forced the student to face the wall alone. Two days later, a Stanford English professor told a campus audience that "European settlers"—Israelis—were attempting to "replace" Palestinians. In January 2024, at a campus event attended by then Stanford President Richard Saller *about addressing* antisemitism, protesters yelled "Go back to Brooklyn," chased a rabbi while chanting "we charge you with genocide," and became so threatening that a weeping multidenominational ring of clergy linked arms to shield Jewish attendees. In March, a Stanford student published an *Atlantic* article describing the antisemitic environment in harrowing detail and grappling with how such a bastion of progress could be so overcome with hate; peers responded that he should be burned alive. And on May 31, 2024, Stanford published its report about campus antisemitism and anti-Israeli bias, finding both so pervasive that the authors demanded "[t]he University itself must . . . be held accountable for its actions—including its failure to respond to the rising wave of antisemitism we have documented." No apology followed. Rather than take responsibility and engage the fundamental work of a university to guide its community toward civility, Stanford let hate fester, metastasize, and course through campus

FIRST AMENDED COMPLAINT

unchecked. Stanford abdicated all responsibility, taking action only to protect itself, even when it meant protecting perpetrators of unlawful bias.

5.      This is the environment Dr. Laps walked into on April 1, 2024. His only prior interactions with his new colleagues had been limited to polite (pre-October 7) Zoom interviews. But his colleagues knew that he was Jewish and Israeli. From the moment he stepped foot in the lab, he was surrounded by hostility.

6.      In his first interaction with a lab staffer, Terra Lin, she introduced herself by telling Dr. Laps to never speak to her. When Dr. Laps tried to sit with colleagues at lunch, she told him to sit elsewhere. When Dr. Laps needed Ms. Lin to order materials, she delayed or snapped at him. Ms. Lin redirected her trash duties to Dr. Laps, and had her friends freeze him out in the limited lab common areas. Dr. Laps noticed that Ms. Lin's social circle overlapped with activists, including one who sought out Dr. Laps to introduce herself as Palestinian before shunning him and never speaking to him again. He also noticed that he seemed to be the only Israeli in the building, and that Ms. Lin treated every other colleague kindly. In such a small environment, the difference, and the treatment, were impossible to miss.

7.      At first, Dr. Laps kept his head down. He knew that Jews and Israelis were being driven off American campuses. But Ms. Lin escalated her behavior. She tampered with Dr. Laps' research, secretly producing results that seemed promising but were, in fact, fraudulent—unbeknownst to Dr. Laps. Before he had a chance to discover it, Ms. Lin advised Dr. Laps to buck scientific standards and trash the proof.

8.      Dr. Laps alerted Dr. Chou, the lab's leader and a mentor whom Dr. Laps assumed would have the utmost concern for integrity and civility in his lab. Dr. Laps and Dr. Chou had just jointly applied for an ambitious and prestigious, three-year research fellowship from the Juvenile Diabetes Research Foundation ("JDRF") to run through 2028. Instead, Dr. Chou tried to get rid of Dr. Laps. Dr. Chou called Dr. Laps into his office and told Dr. Laps that the Stanford Title IX office had advised that Dr. Laps was under investigation. Dr. Chou pushed Dr. Laps to flee scrutiny, campus, and the country. Dr. Chou threatened that Dr. Laps' career and immigration status were on the line.

9.      ***But it wasn't true.*** Dr. Chou told Dr. Laps that the news had come "from the Title IX office" to make it seem real, when, in fact, Dr. Chou and colleagues had colluded to "report" a Title IX

FIRST AMENDED COMPLAINT

issue without any complaining victim. When Dr. Laps contacted the Title IX office himself, the office confirmed that it had never contacted Dr. Chou. Rather, the Title IX office advised Dr. Laps and Dr. Chou that no formal complaint about Dr. Laps' conduct had ever been received; that Dr. Laps was in good standing; that Dr. Laps was not under investigation; and that Dr. Laps was protected from retaliation going forward.

10.     Dr. Laps' dream had become a nightmare. His own mentor was unceremoniously pushing him off campus, threatening his career with a dangerous lie. Dr. Laps assumed that Stanford itself would be aghast and interested in rooting out the discrimination and retaliation he was suffering. He wrote to the School of Medicine Dean Lloyd B. Minor and President Jonathan Levin, and made a formal report of bias.

11.     Stanford responded by dismissing *Dr. Laps*. When Dr. Chou locked Dr. Laps out of the lab, rescinded his support for the JDRF grant, and defamed Dr. Laps to colleagues with outright lies about "legal licensing," Stanford concluded that the conduct was pursuant to its rules and lawful. When Dr. Laps won the prestigious three-year JDRF grant that Stanford had helped him apply for, Stanford reneged on its commitment to support it. Flouting the law, Stanford refused to investigate Dr. Laps' retaliation claim for *months*, holding the claim hostage while using the grant as leverage to bully Dr. Laps to rescind his complaints so that Stanford would not have to investigate. Stanford made it clear that it would not protect Dr. Laps. Alone against a hostile institution prepared to destroy his career to avoid scrutiny, Dr. Laps had no choice but to resign.

12.     As a result of Stanford's actions, Dr. Laps has lost years of his early career, a prestigious fellowship, and most distressingly, an opportunity to use his talents to help the world. Dr. Laps has asked only for what the law requires: justice and an environment that does not discriminate and retaliate against him merely for his religion, national origin, and ethnicity. These interests should have been aligned with Stanford's own. But Stanford used its gravitas to bury Dr. Laps' claims, and ultimately, Dr. Laps himself, rather than address its acute antisemitism and anti-Israel bias. Dr. Laps brings this action in the hopes of securing the equity and accountability that should have always existed at Stanford, but to his dismay, never did.

**PARTIES**

13.    Defendant Leland Stanford Junior University is a private university located in Stanford, California.

14.    Stanford is a California-registered tax-exempt 501(c)(3) organization. Its principal place of business is located at 450 Jane Stanford Way, Building 10, Stanford, California, 94305.

15.    Stanford has received more than $1 billion in federal funding, largely in the form of research grants, such as a $13,583,492 grant to the Stanford Diabetes Research Center.

16.    Dr. Danny Hung-Chieh Chou is natural person and a tenured Associate Professor in the Division of Endocrinology and Diabetes, Department of Pediatrics, School of Medicine at Stanford. On information and belief, at all times relevant to this lawsuit, Dr. Chou has been domiciled in Palo Alto, California.

17.    At all times relevant to this lawsuit, Dr. Chou ran the Danny Chou Lab at Stanford (the "Chou Lab" or "Lab"), which, among other things, seeks to develop new methods of peptide and protein synthesis and the development of glucose-responsive "smart" insulin.

18.    Dr. Shay Laps is a natural person and a Jewish citizen of Israel, domiciled in Israel.

19.    At all times relevant to this lawsuit, Dr. Laps temporarily resided in Palo Alto, California, and was a Postdoctoral Scholar in the Department of Pediatrics, Division of Endocrinology at Stanford, in the Chou Lab, with the intention to return permanently to Israel.

**JURISDICTION AND VENUE**

20.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under the laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's state law claims which "form a part of the same case or controversy."

21.    The Court additionally has subject-matter jurisdiction over this action based on the diversity of the parties, pursuant to 28 U.S.C. § 1332.

22.    The amount in controversy exceeds $75,000, exclusive of costs and interest.

23.    The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

24.     Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b), because at least one Defendant resides in this district and all Defendants reside in the State of California, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.     DR. SHAY LAPS.**

25.     Dr. Laps is a decorated chemist, educator, and athlete from a small town outside of Haifa, Israel. He has been fascinated with chemistry, and with peptides (short chains of amino acids) and proteins (longer chains), from a young age, particularly insulin. Smitten with insulin's unique molecular structure, and fascinated by its role as both a protein and a drug, and given that his grandmother had been a diabetic, at a young age, Dr. Laps dedicated his career to its study. It has always been Dr. Laps' dream to open his own lab studying peptides and protein synthesis.

26.     Dr. Laps obtained a BSc degree and a Chemistry Teaching Certificate in Chemistry from the Hebrew University of Jerusalem ("Hebrew University") in 2011, a teaching license from Levinsky College in 2012, and an MA degree in Science and Technology Education from Ben Gurion University in 2014. He taught high-school and college-level chemistry throughout his graduate studies.

27.     As an Israeli citizen, Dr. Laps was required by law to perform military service in the Israel Defense Forces ("IDF") after graduating from high school. Dr. Laps received an IDF academic fellowship in 2008, a prestigious award that enabled him to pursue his BS in chemistry first, and then perform his national service as an officer by teaching underserved high school students. Dr. Laps served as a Senior Academic Officer between 2011 and 2015, teaching chemistry while pursuing his degrees.

28.     Dr. Laps obtained his PhD from the Technion-Israel Institute of Technology[1] (the "Technion") in 2021, where he focused on palladium chemistry in peptide and protein synthesis and

[1] The Technion is a prestigious math, science, and engineering research university known worldwide as "Israel's MIT." It was founded by Jews in 1912 under the Ottoman Empire. Its early position was bolstered most notably by the Technion Society, founded and first chaired by Albert Einstein. The Technion is known as the driving engine of Israel's globally recognized high-tech industry and the origin of groundbreaking Parkinson's disease treatment, satellite-launching capabilities (shared with only four other such student programs in the world), the international standard of data compression, and ubiquitous web programming language. But the Technion's most internationally recognized contributions are in Dr. Laps' field of chemistry. Four Nobel laureates have been associated with the

manipulation. He earned a MSc degree in Chemistry in 2017, became a member of the American Peptide Society in 2019, and was awarded the Jacobs Prize for outstanding PhD students in 2020. Dr. Laps' dissertation research at the Technion yielded a groundbreaking method for producing multi-ring (sulfur-sulfur) bonds in proteins and peptides, thereby solving a challenge that had vexed modern chemistry for over sixty years.

29. Dr. Laps was selected for the Israel Academy of Sciences Excellence Fellowship Program, from which he received two consecutive fellowships to work as a postdoctoral fellow in labs at Hebrew University's Institute of Chemistry from 2021 to 2023.

30. Following his fellowships, Dr. Laps applied to elite research universities in the hopes of further developing his research under the tutelage of leading peptide and protein chemists. Dr. Laps had the recommendation of world-renowned chemists, including a Nobel laureate in Chemistry. Dr. Laps received offers to continue his postdoctoral research at Hebrew University for five additional years, and at Cambridge University, where he was recruited.

31. Dr. Laps had simultaneously developed an interest in Stanford and Dr. Chou's lab. Dr. Laps initially discovered the Chou Lab when Dr. Chou "liked" a social media post about Dr. Laps' novel PhD research (research the Chou Lab later cited and utilized in its effort to create novel synthetic insulin), and Dr. Chou requested to "follow" Dr. Laps' social media profile. Dr. Laps recognized Dr. Chou as an upcoming assistant professor doing innovative work in the peptide chemistry space, in perfect alignment with Dr. Laps' own research interests. Dr. Laps applied for a postdoctoral position at Stanford accordingly. Stanford and Dr. Chou had Dr. Laps go through a long and rigorous interview process involving several interviews with Dr. Chou and other members of the lab, all of which occurred prior to October 7, 2023. It was apparent to both Dr. Chou and Dr. Laps that Dr. Laps' research would require several years, and that the significant achievements for which Dr. Laps was being recruited could not be accomplished in a single year. Dr. Chou affirmatively offered to Dr. Laps on multiple occasions during these conversations, and in response to Dr. Laps' questions about the subject, that Dr. Laps was being

Technion, all in chemistry, and one of whom (Dr. Aaron Ciechanover, M.D.) recommended Dr. Laps. The Technion is well known to academics across the world in the fields of math, science, engineering, and most of all, chemistry.

recruited for multiple years of significant research, and three years at minimum. Dr. Chou told Dr. Laps that even if Dr. Laps exceeded any technical limit on postdoc support at Stanford, there were several means to continue on as a postdoctoral fellow or, if necessary, in alternative positions at the lab. Dr. Chou had stated to Dr. Laps that he understood and intended that, if the Chou Lab and Stanford extended an offer to Dr. Laps, Dr. Laps would perform research at the Chou Lab for years to come. Dr. Laps shared that intention. On information and belief, Dr. Chou has supported several years of postdoctoral fellowship for others in the Chou Lab that were not Jewish or Israeli.

32.     On or around January 25, 2024, Stanford's School of Medicine offered Dr. Laps an appointment as a postdoctoral scholar in the Department of Pediatrics, Division of Endocrinology to develop new insulin analogs in the Chou Lab. The offer provided: (1) Dr. Laps would enjoy non-matriculated graduate student status, as the purpose of his position was to pursue advanced studies, research and training under the mentorship of Dr. Chou as his faculty mentor; and (2) Dr. Laps would be considered an employee of Stanford, employed as 100% full-time equivalent, providing him with employment benefits and requiring him to fulfill work-related training pursuant to California employment law.

33.     Dr. Laps was classified by Stanford as an "STU-Student Employee," and at all times during his appointment, received a salary in exchange for his services in the Chou Lab. Dr. Laps also received benefits and resources that, on information and belief, were consistent with that of a full-time enrolled Stanford student, such as a Stanford email and computer account, library and campus privileges, recreational facilities privileges, access to Stanford graduate student housing, and the ability to take Stanford courses.

34.     Dr. Laps accepted Stanford's offer of appointment on or around the end of January 2024. Dr. Laps was thrilled by the opportunity to bring his research to Stanford and work alongside Dr. Chou. But as Dr. Laps was soon to learn, Stanford did not present a welcoming environment in 2024 to an Israeli citizen whose CV noted his service as an officer in the IDF.

**B.     OCTOBER 7, 2023 AND THE RESPONSE AT STANFORD.**

35.     Dr. Laps' offer of employment with Stanford followed mere months on the heels of October 7, 2023. The date needs no introduction. At sunrise on Simchat Torah, a Jewish religious holiday,

Gaza-Strip based terrorists launched 4,300 rockets at Israel before approximately 6,000 militants led by Hamas attacked 21 Israeli towns, recreational beaches, an open-air music festival, and police and military outposts by land, sea, and air. Approximately 1,200 people were murdered, most of them civilians, including the elderly and children, and 250 were taken hostage to the Gaza Strip. Approximately three weeks later on the evening of October 27, Israel deployed ground forces that marked the beginning of a large-scale war.

36.    In the immediate aftermath of the attack and *before* the Israeli ground invasion, campus protests and rallies erupted. From virtually the moment they began, many of those protests and rallies reflected a disturbing undercurrent. Most did not protest the massive Hamas attack on humanity, or rally to the causes of comity and goodwill; they protested the *existence* of the State of Israel and some even cheered on the massacre.

37.    Stanford succumbed to this toxicity almost immediately. On or around October 12, 2023, at a supposed campus "teach in," Stanford Professor of Comparative Literature David Palumbo-Liu told the Stanford crowd that "European settlers" intended to "replace" the "native population" of Palestine. When a second speaker railed, "You ask us, do we condemn Hamas [for October 7]? FUCK YOU!," the crowd went wild. When encampments took over a main campus plaza, their signs and protests proclaimed "Die Israel" and repeated the ludicrous charge that Israel was harvesting the organs of Palestinians. They celebrated Hamas, invited notorious antisemites to speak, and platformed calls for violence. One Stanford professor enthusiastically encouraged students to compare the 19th century conception of Zionism for Jews to return to their ancestral homeland to Hitler's vision of Aryan Germany. On the first day of Winter Quarter 2024, protesters took over the class of a Jewish professor to grandstand about the war in Gaza, and two weeks later, masked students interrupted another Stanford course—unrelated to Jewish studies, but with a conspicuously Jewish instructor who wore a kippah—by banging on the windows and slipping a flier under the door: "You're being taught by a Zionist. Drop this Class."

38.    The examples are too many to catalogue, but two events are illustrative. First, on or around October 10, 2023 and according to students in the room, the instructor of a mandatory seminar designed to introduce Stanford freshmen to campus life threw out the day's lesson to opine that the events of October 7 were "justified," constituted "military force" and "not terrorism," and that Israel was to blame.

He told the Jews in the room to raise their hands, picked a student out, kicked away the student's chair, took away the student's belongings, and directed the student to stand and face the wall. The instructor apparently gave similar performances in additional sections, informed students that more people have died from colonization than the Holocaust (which, in his words, had "only" six million Jewish deaths), and had students identify their national origins so that he could label them either "colonized" or "colonizer." (When a student identified their homeland as Israel, he responded "Oh, definitely colonizer.") These students were three weeks into their college careers. The course, titled "COLLEGE 101: Civic, Liberal, and Global Education" ("COLLEGE 101"), was supposedly intended by Stanford to teach new freshmen "the skills that empower and enable us to live together." When the lecturer was dismissed for this wildly inappropriate conduct, 1,700 students signed a letter demanding his reinstatement.

39.    Second, at a January 24, 2024 Stanford forum focused on combatting antisemitism attended by Stanford president Richard Saller and provost Jenny Martinez, according to media reports, "protesters" created a hostile "human tunnel" at the entrance (much like anti-abortion activists have at clinics, to intimidate anyone going in the door), drowned out panelists, yelled at Jewish students to "Go back to Brooklyn!" and "off our fucking campus," ominously threatened to "take all of your places and ensure Israel falls," and ranted about unhinged conspiracy theories like Jewish involvement in child trafficking. While Saller was able to exit a side door, the protesters chased a Stanford rabbi while chanting "There is only one solution! Intifada revolution!" and "Zionist, Zionist, you can't hide, we charge you with genocide!" When a student wearing a kippah (or yarmulke) approached, the group taunted him "the IDF killed your hostages," then pulled him aside to say "we're watching you" as police stood nearby. When a Stanford employee tried to intervene, a protestor threatened the employees in attendance, saying "we know your names and we know where you work" and would "soon find out where you live." The situation was so threatening that a multidenominational ring of clergy tried to physically protect Jewish students, while the rabbi and imam apparently wept. It bears repeating: this was not an event focused on Israel or even the conflict in Gaza; it was a forum *to combat antisemitism*.

40.    The tenor on campus was inescapable: the Israeli-Palestinian conflict was embraced on campus in a comic book version: the good guys and bad guys were easily identifiable, and there was no one in the middle. As the COLLEGE 101 lecturer explained, Israelis—and thus Jews—were the colonizer;

FIRST AMENDED COMPLAINT

oppressor. Palestinians, under this paradigm, were the colonized; the oppressed. Sides had to be chosen, and could simply be assigned based on identity. And acknowledging the suffering or bias against one (e.g., antisemitism or the murder of 1,200+ civilians) was to abandon the other. The game is zero sum. And, like at many other universities, the phenomenon at Stanford exploded from true believers to campus masses, and from mere opinion to righteous social obligation. The pressure of the environment was overwhelming.[2]

41.     Stanford did not merely fail to meet this moment. The university lost the entire plot of higher education to such a staggering degree the Office of Civil Rights felt it necessary to get involved. On December 7, 2023, then-President Biden's Department of Education opened an investigation into Stanford for Title VI national origin discrimination involving religion.[3] On May 7, 2024, just after Dr. Laps arrived on campus, the same office issued Stanford a letter warning that "harassment [that] creates a hostile environment" on campus violated federal civil rights law, that those laws protected students targeted for their perceived Jewish ethnicity, religion, or Israeli national origin, and that failure to rectify such an environment would be met with enforcement action.[4]

42.     Even Stanford *itself* concluded that it has a severe problem with antisemitism and anti-Israeli bias in the wake of October 7. Following October 7, the University commissioned the

---

[2] A few days before Dr. Laps arrived, the hostility roiling the campus was covered nationally in *The Atlantic*, where student-journalist Theo Baker noted that "Jewish students of all political beliefs[] have been given good reason to fear for their safety" at Stanford, that some Arab and Muslim students also felt unsafe, and that "[i]n a remarkably short period of time, aggression and abuse have become commonplace, an accepted part of campus activism." Theo Baker, *The War at Stanford,* The Atlantic (Mar. 26, 2024), https://www.theatlantic.com/ideas/archive/2024/03/stanford-israel-gaza-hamas/677864/, *available at* https://archive.is/k8Vpy.

[3] U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=All&field_ois_type_of_discrimination=All&items_per_page=20&field_ois_institution=Stanford&field_ois_institution_type=All&field_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3= [https://perma.cc/ZDH7-4SQT].

[4] May 7, 2024 letter from the Assistant Secretary for the United States Department of Education Office of Civil Rights to Stanford ("Dear Colleague Letter: Title VI and Shared Ancestry or Ethnic Characteristics Discrimination"), https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf-35100.pdf [https://perma.cc/W9MP-FLUG].

Subcommittee on Antisemitism and Anti-Israeli Bias at Stanford University (the "Subcommittee" or "Stanford Subcommittee") to investigate antisemitism and anti-Israeli bias on campus. On May 31, 2024, the Stanford Subcommittee, (made up entirely of interested Stanford affiliated staff, faculty, student, and alumni), titled its report with its conclusion: "It's in the Air" (the "Report" or "Antisemitism Report").[5] The Subcommittee's findings speak for themselves:

> After six months of investigation, the Subcommittee has unanimously concluded that Stanford is today confronted by a degree of antisemitism and anti-Israeli bias that is widespread and pernicious. . . . [This Bias] is [often] wrapped in layers of subtlety and implication[.] … Some of the examples we heard did not involve singular actions or expressions but a pattern of bias intimidation … Jewish students (and some faculty and staff) felt isolated or abandoned, with no clear expression of support from the University (or from their school or program) . . . for the intimidation and hostility they encountered in their programs.[.] … [F]aculty complained of the general atmosphere of antisemitic and anti-Israeli sentiment on campus and the failure of the university to condemn blatant expressions of it. … The staff we interviewed echoed many of the same themes…

The Subcommittee found that some of the most noxious environments on campus were the School of Medicine (where Dr. Laps was appointed) and research labs (like the one Dr. Laps joined), where the "environment . . . can amplify interpersonal dynamics and make it nearly impossible to avoid individuals who have been antisemitic or displayed anti-Israeli (or other) bias."

43.    The Subcommittee concluded that the Stanford administration itself exhibited a pattern and practice of discounting, permitting, and justifying antisemitism and anti-Israeli bias, and that "repeated requests to assess antisemitism on campus and reform policies to reflect it have basically been ignored."[6] On information and belief, the bias within the administration goes unchecked, in part, because Stanford's administrators appear to be complicit in perpetuating antisemitism and anti-Israeli bias on campus in

---

[5] *"It's in the Air": Antisemitism and Anti-Israeli Bias at Stanford, and How to Address it*, Subcommittee on Antisemitism and Anti-Israeli Bias of the Jewish Advisory Committee at Stanford University (May 31, 2024), https://news.stanford.edu/__data/assets/pdf_file/0033/156588/ASAIB-final-report.pdf [https://perma.cc/LU8S-K7JZ.]

[6] "Another recurrent theme . . . was the failure of the University to respond to complaints of bias adequately, expeditiously, or at all. . . Some said requests to assess antisemitism on campus and reform policies to reflect it have basically been ignored. … The trend in recent years, but especially since October 7, has been normalization of antisemitic and anti-Israeli speech on campus, and an 'impression of indifference' on the part of the University. . ."

dereliction of their duty to ensure Stanford's compliance with federal and state civil rights laws. As the Report noted:

> Ironically, the claim that Stanford is institutionally antisemitic has not only been leveled as a grave criticism of the University but also as an excuse for failing to take remedial action. In response to a graduate student complaint detailing one of the most serious situations of antisemitism that we have encountered in the six months of our work, a high-level administrator in a school responded, "At the end of the day, antisemitism is institutional, there is nothing I can do about it."

As the administrator reported, Stanford refuses to consistently protect victims of antisemitic and anti-Israeli bias or hold perpetrators accountable as a pattern and practice.[7] This invited a secondary infection: retaliation. The Report noted that Jews and Israelis "worried that if they reported or called out antisemitism there would be no consequences, or even worse, that faculty, peers, and friends would likely 'disown' them or deny them professional or academic opportunities."

44.     Stanford's failure has an explanation. As a Stanford Law professor explained in the Report: the "university system is designed to bury complaints about antisemitism in a black hole. Universities have corporate incentives to bury problems and make sure no one ever finds out what's going on. Students feel like it gets them nowhere and it does get them nowhere." On information and belief, Stanford is deliberately covering up and protecting the antisemitism and anti-Israeli bias coursing through its campus, burying complaints, bullying complainants to rescind them, and coming to predetermined outcomes to find no discrimination occurred when the law forces them to investigate. Dr. Laps would come to suffer each element of this treatment.

**C.     DR. LAPS JOINS THE CHOU LAB AND ENCOUNTERS IMMEDIATE HOSTILITY.**

45.     Dr. Laps arrived at Stanford on April 1, 2024 to begin his postdoctoral work at the Chou Lab. Dr. Laps was aware from the moment he arrived at Stanford that the campus was a tinderbox. The issue of his identity surrounded him everywhere he went. At first, Dr. Laps hoped things would improve, not just at Stanford, but globally. He remained grounded in the reason he had come: to conduct chemistry in the Chou Lab.

---

[7] As one staffer explained: "As a Jewish person . . . I reached out to HR, and I was told you do not have any protection. It's forced me to consider taking a leave, which would be career damaging."

46.    The Chou Lab is housed under the Division of Endocrinology and Diabetes in the Department of Pediatrics at Stanford's School of Medicine. Its research focuses on the "concepts of chemical biology, protein engineering and structure biology to design new therapeutic leads and generate probes to study biological process." In addition to Dr. Chou, the Chou Lab is comprised of four postdoctoral fellows, two research/administrative assistants, one PhD student, and intermittently, a visiting MSc student.

47.    Prior to Dr. Laps' arrival at Stanford, members of the Chou Lab (and others that interacted with Dr. Laps regularly) were aware that Dr. Laps was not American, and that he was both Jewish and Israeli. Dr. Chou had circulated Dr. Laps' CV to the lab prior to his start date, which noted Dr. Laps' accolades from Israeli institutions, his service in the IDF, and other accomplishments in Israel.

### 1.    *Ms. Lin's Hostility in the Chou Lab.*

48.    Dr. Laps was elated to join the Chou Lab's team, but encountered immediate hostility from the Chou Lab's research assistant (referred to as a "Life Science Research Professional 1," or "LSRP"[8]), Terra Lin. Ms. Lin was responsible for welcoming Dr. Laps to the Chou Lab and for ordering materials that he required. But in her first interaction with Dr. Laps on his first day, she instructed him never to speak with her in person, and that if he needed something, Dr. Laps should ask for it in writing. Troublingly, Dr. Laps noted that Ms. Lin conversed with everyone else in the Lab cordially and did not have the rule for anyone else. Her hostility was reserved for Dr. Laps alone—despite never having met or spoken with him before.

49.    Dr. Laps later noticed that Ms. Lin socialized regularly with students and others on campus active in anti-Israeli protests on campus roiling Stanford and making national headlines. He came to understand that Ms. Lin was hostile to him from the moment of his arrival because she, like the campus demonstrators who incessantly vilified Israel and Israelis, took issue with his Jewish faith, history, and

---

[8] The LSRP position is an entry-level staff role that supports lab research by managing experiments, collecting data and maintaining records, assisting in the tasks of publication like preparing written documents, and generally seeing to lab maintenance, like maintaining stock and managing inventory. LSRPs also assist in orienting new lab staff or students.

14

FIRST AMENDED COMPLAINT

heritage as well as his Israeli national origin. He noticed that anyone Ms. Lin interacted with regularly would later shun him.

50.    Dr. Laps felt besieged constantly by hostility for, and hatred toward, Israelis: on one of Dr. Laps' first days at Stanford, a fellow researcher from Saudi Arabia asked Dr. Laps where he was from. Dr. Laps cordially responded that he was from Israel. The researcher abruptly turned his back and never spoke to Dr. Laps again. Dr. Laps witnessed the massive pro-Palestinian encampment on the main campus, beside empty chairs with pictures of Israeli hostages, and repeatedly was made abundantly aware he was the sole known Israeli in the lab's building. A Palestinian activist in the School of Medicine and friend of Ms. Lin who, knowing nothing about Dr. Laps other than his national origin, made a point of introducing herself to Dr. Laps affirmatively as "a resident" of a particular city in the West Bank and then never spoke with him again. Ms. Lin's attempts to ostracize Dr. Laps increased. When Dr. Laps attempted to sit with his Chou Lab colleagues at lunch, Ms. Lin told Dr. Laps he was not welcome to sit with the group and needed to sit somewhere else. She did the same in other social situations, and each time, other members of the Lab present said nothing. Thereafter, Ms. Lin routinely directed him to sit elsewhere in situations where Dr. Laps might need to sit near Ms. Lin. In another encounter, when Dr. Laps and Ms. Lin once approached the same elevator, he politely offered "Good Morning." In response, Ms. Lin turned on her heels to walk to the other side of the building.

51.    Baker's *Atlantic* article explained the phenomenon Dr. Laps was suffering: "Everyone knows that the only reliable way to get into a school like Stanford is to be really good at looking really good. Now that they're here, students know that one easy way to keep looking good is to side with the majority of protesters, and condemn Israel." Baker asked, "can [a Stanford attendee] truly be so ignorant as to advocate widespread violence [against Jews] in the name of peace [for Palestinians]? When the world is rendered in black-and-white—portrayed as a simple fight between colonizer and colonized—the answer is yes."[9]

---

[9] In fact, Baker's story is the prime example; after publishing his article and around the time Dr. Laps came to Stanford, anonymous Stanford staff or students on a campus-only social network apparently urged that Baker ought to be waterboarded and lit on fire.

52.    In the physical context of the lab—just as the Antisemitism Report had cautioned Stanford—the social outcast treatment Dr. Laps received for no reason was highly visible and unmistakable.

53.    Ms. Lin's responsibilities as an LSRP included ordering compounds, materials, and equipment for every researcher in the Chou Lab. Time is of the essence in chemistry, and delays risk ruining research or compounds that can be difficult or impossible to re-obtain or re-perform. Ms. Lin routinely attempted to frustrate, delay, or inhibit Dr. Laps' requests for research materials, equipment, and compounds. On several occasions, Dr. Laps' materials were delayed and/or he was provided with outdated equipment that made his experiments more difficult to perform adequately. Once, on or around July 18, 2024, Dr. Laps inquired with Ms. Lin about a reagent he had ordered for his research. Her response was to snap, "before you even think about approaching me, you should check everything twice." On another occasion that summer, when Dr. Laps requested that Ms. Lin order a compound, weeks went by without update. When Dr. Laps politely inquired about the status of the order, Ms. Lin refused to help Dr. Laps and directed Dr. Laps to a colleague then in the hospital recovering from a severe car accident—a referral that was clearly intended to be no help to Dr. Laps at all. To Dr. Laps' knowledge, no other Chou Lab researcher had regular difficulty obtaining their materials, equipment, and compounds from Ms. Lin. But Dr. Laps did not enjoy the same routine support in the Chou Lab as other similarly situated researchers.

54.    A little over a month after Dr. Laps' arrival, he began to realize that the sentiment at Stanford was worse than he had realized when he arrived. Dr. Laps had seen the encampments and anti-Israeli signs in White Plaza while walking through campus, and the constant news coverage, including signs strung up for all to see accusing Israel (and Israelis) of genocide. But in or around early May, Dr. Laps recalls seeing the photos and coverage of a viral photo: a bespectacled individual sitting at an outdoor Stanford picnic table on campus using their cell phone nonchalantly, their face and head wrapped in a black balaclava that showed only their eyes and a green Hamas headband tied around their forehead. This is the unmistakable uniform of the Hamas Al-Qassam Brigades, the specific "military" wing of Hamas responsible for October 7 and terrorist attacks on Israeli civilians for the last 30 plus years.

55.    Dr. Laps also observed that Stanford was doing next to nothing to counter the hatred being sown by protestors on campus that it euphemistically attributed to "deep concern and passionate debate"

FIRST AMENDED COMPLAINT

regarding "events in the Middle East." Stanford's primary responses were "campus policies reminders" and "update" letters with warnings that individuals could be referred for further Stanford investigation. One President and Provost letter seemed to attempt to explain the lack of action: Stanford thought the issue was "limited in scope and has not escalated to more severe disruption of university activities as has occurred on some other campuses." Unsurprisingly, the discourse on campus escalated further to verbal threats, insults, and provocations. Then in late May 2024, an anti-Israel protest took over a Stanford engineering lab building full of sensitive and dangerous equipment, terrified researchers, students, and faculty in the lab, and vandalized the interior. President Saller "made remarks" in response with vague references to investigation and discipline, but also "respect [for] the privacy rights of those involved." In early June, anti-Israeli protesters stormed the administrative building housing President Saller's office, barricaded themselves inside, and vandalized the offices and property, including splattering fake blood inside. They spray painted "DE@TH 2 ISR@HELL" on the concourse, "Kill cops," "Burn this shit down," and defaced a memorial to Stanford American war veterans with "FUCK AMERIKKKA." Stanford had to call the Santa Clara County Sherrif and Palo Alto Police to clear the building. One police officer had to be carried out by stretcher. Dr. Laps remembers this event and felt deeply alarmed. The District Attorney later charged twelve individuals with felonies, but Stanford's inaction in the face of these escalating threats was emblematic of its ratification of the antisemitism Dr. Laps suffered from the start of his employment.

56.    Ms. Lin's hostility increased and spread to others. Shortly after Dr. Laps started, Chou Lab Manager Dr. Nai-Pin "Phil" Lin ("Dr. Lin")[10] and Ms. Lin reassigned Ms. Lin's job of removing lab trash to Dr. Laps. Dr. Laps questioned this assignment with Dr. Chou and Dr. Lin, noting that it was an LSRP responsibility. In response, Dr. Lin and Dr. Chou acknowledged it was a job that had never been assigned to another postdoc but refused to change it.

57.    Dr. Laps also continued to have issues ordering materials and equipment, which Ms. Lin and Dr. Lin were responsible for placing and facilitating. On one occasion, Dr. Laps and other colleagues placed the same order for the same equipment at the same time, and while his colleagues received theirs

---

[10] Dr. Lin and Ms. Lin are not married, but Dr. Laps is not aware whether Dr. Lin and Ms. Lin are related.

timely, Dr. Laps' order was delayed another several weeks. Dr. Laps asked Dr. Lin about the delays, since Dr. Lin and Ms. Lin were responsible for placing and facilitating Lab orders. Dr. Lin attributed the delay in this instance to a "misunderstanding," and as to the general trend, Dr. Lin said he lacked control over delivery times and refused to check the status of orders with suppliers. Instead of addressing the issues, Dr. Lin tried to provide Dr. Laps with old, inferior equipment instead of the new materials Dr. Laps' colleagues received. Dr. Laps inquired with others and found they did not have similar timeliness issues with any of their materials orders. Dr. Laps attempted to discuss the delays of his orders with Dr. Chou, as well. For example, on one occasion, Dr. Laps noted to Dr. Chou that he had been waiting an unusually long time for materials critical to his research. Dr. Chou did not respond. Dr. Chou and Dr. Lin both failed to address the issues and permitted Ms. Lin to continue her pattern of conduct.

58.     Ms. Lin then began to tamper with Dr. Laps' research. It was Ms. Lin's job in the Chou Lab to test compounds as part of the lab's projects to develop smart insulin and non-insulin compounds as replacement for real insulin. Dr. Laps had prepared eight novel compounds he hoped might mimic insulin, and had Ms. Lin test them. Dr. Laps remembers discussing the compounds with the Lab, including in Ms. Lin's presence, and that the entire Lab voiced particularly high hopes that compounds 1 and 7 might mimic insulin. Ms. Lin performed those assays and reported her results on June 25, 2024. She recorded promising findings: that compounds 1 and 7 yielded high levels of activity suggesting they mimicked insulin. As it happened, compounds 1 and 7 were what Dr. Laps thought most likely to mimic insulin. The Lab was thrilled. No one realized at the time that Ms. Lin had tampered with the experiments.

59.     After recording the findings and reporting them, Ms. Lin made an unusual request to Dr. Laps: to destroy the samples used. Dr. Laps was new to the lab at the time, but all of his training had taught him that Ms. Lin's request was unusual. Dr. Laps ignored her recommendation and took all necessary steps to maintain the samples in appropriate cold storage unbeknownst to Ms. Lin.

60.     In or around late August 2024, Dr. Chou asked Dr. Laps if Dr. Laps had kept the compounds. Dr. Laps said that he had, and provided them to Dr. Chou. Dr. Chou tested Dr. Laps' compounds, and found two things: (1) the compounds were pure and free of insulin, just as Dr. Laps had reported they were; and (2) the opposite of Ms. Lin's results—that compounds 1 and 7 yielded low levels of activity, and thus did *not* mimic the properties of insulin.

FIRST AMENDED COMPLAINT

61. Only one conclusion was possible. If the original samples had no insulin and did not mimic insulin, but Ms. Lin's results showed the properties of insulin, Ms. Lin must have *introduced real insulin* into compounds 1 and 7 selectively during testing, completely compromising the experiments. These are the sorts of errors that Stanford and Chou Lab standard practices should prevent, and if such errors occurred mistakenly, they would cast serious doubt upon the adequacy of those practices. It is not realistically possible that insulin would be introduced accidentally to only two, separate, non-proximate compounds. Although Dr. Chou had no choice but to conclude that Ms. Lin had tampered with the compounds during testing, he still did not perform the additional tests that could shed light on what, exactly, Ms. Lin had done and why.

62. On information and belief, Ms. Lin purposefully inserted insulin into the two compounds Dr. Laps was least likely to suspect of tampering, and then instructed Dr. Laps to discard the compounds, in order to set him up to be accused of research fraud, which could have ended his career.[11] Had Dr. Laps discarded the compounds and failed to take other measures to maintain them adequately, he would not have been able to prove that the compounds he had created did not contain real insulin, and thus that the fraud occurred at the assay stage Ms. Lin performed.

63. On information and belief, neither Dr. Lin nor Dr. Chou ever did anything to address Ms. Lin's conduct. Neither did Stanford.

64. During the course of his postdoc, Dr. Laps spoke with other Israelis, who reported similar treatment. A WhatsApp group of other Stanford students and researchers kept him abreast of the other experiences Israelis and Jews were having on campus, such as one Stanford graduate student who cautioned the group from using a particular floor of a main campus building that was constantly awash in anti-Israeli signs and protesters.

---

[11] These consequences are not theoretical. In 2023, Stanford's student newspaper claimed Stanford's then-president, Dr. Marc Tessier-Lavigne, had intentionally falsified data for an article almost fifteen years prior. Stanford commissioned an external investigation, found the claim to be without merit, and cleared Dr. Tessier-Lavigne of research fraud or any other intentional or reckless wrongdoing. Nevertheless, Dr. Tessier-Lavigne was forced to step down as Stanford's President due to unintentional research flaws discovered as a result of the investigation. The source of the problem, apparently, was impure samples.

FIRST AMENDED COMPLAINT

65.    For all of these reasons and the retaliatory concerns cited in the Report, Dr. Laps was initially reluctant to voice his belief that he was being discriminated against on the basis of his religion, ethnicity, and national origin.

**D.    DR. LAPS AND DR. CHOU APPLY FOR THREE YEARS OF PRESTIGIOUS JDRF RESEARCH FUNDING.**

66.    Dr. Laps' relationship with Dr. Chou had begun strong. They were so aligned, and Dr. Chou was so impressed with Dr. Laps' experience, potential, and work ethic, that they agreed to work together to seek a prestigious, multi-year, six-figure fellowship grant from the Juvenile Diabetes Research Foundation, also known as BreakthroughT1D ("JDRF"). JDRF is the most prestigious grantmaking institution in Dr. Laps and Dr. Chou's field of research, and the fellowship grant they pursued was extremely competitive. Stanford's policies are designed to allow postdoctoral researchers to continue at Stanford as long as necessary to complete such fellowships, and Stanford considers extensions in these circumstances standard.

67.    Around June 2024, Drs. Chou and Laps submitted their JDRF application. They proposed a project that would run through 2028 which they hoped would yield biologically-responsive "smart" synthetic insulin (the "JDRF Proposal" or "Proposal"). The project had the potential to change the lives of millions of diabetics and supersede virtually every pharmaceutical in the market for human insulin, a nearly $20 billion industry. And if the project succeeded, Dr. Laps' career would have been made, likely resulting in a tenured professorship at his choice of research institution and, eventually, a lab of his own.

68.    Though the JDRF Proposal would have been funded by JDRF if awarded, in order to apply for it, Stanford advised Dr. Laps that he needed to have, and demonstrate in writing, active financial support from Stanford for the entire period the fellowship was to run.

69.    On or around June 25, 2024, Margaret Murphy, Stanford School of Medicine Department of Pediatrics Associate Director of Postdocs and Students, verified Dr. Laps' Stanford salary for 2024-2025, 2025-2026, 2026-2027, and 2027-2028. Stanford held out this information, which Stanford referred to as "verification," to JDRF as confirmation of its support for the three-years of research envisioned by the Proposal.

FIRST AMENDED COMPLAINT

70.    The JDRF Proposal was ambitious, but Dr. Chou's support for Dr. Laps' project was unqualified. Dr. Laps was listed on the Proposal as the Principal Investigator, and Dr. Chou as the required Mentor-Sponsor. Dr. Chou also listed himself as a participant in the project in the separate "collaborative arrangements" section of the Proposal. The two of them worked together, with Stanford's administrators, to compile the 40+ page Proposal, listing both scholars' experience, research histories, accomplishments, contributions to science, and plans.

71.    The Proposal required Dr. Chou to detail his long and short-term plans to mentor, sponsor, train, and support Dr. Laps. Dr. Chou wrote, among other things:

a.    "I confirm that Dr. Laps has all the necessary resources and facilities to finish the proposed work under my supervision";

b.    Details of the Chou Labs' record of training success, "in the diabetes field," with examples;

c.    "I will strive to provide an exceptional training environment for [Dr. Laps] to achieve his goal as an independent researcher in the field of diabetes research. The training plan that I have developed for Dr. Laps will consist of individual mentorship, a research and career advisory committee, laboratory feedback and discussions, departmental/institutional research presentations and seminars, professional research conferences, and career development courses."

d.    A description of the institutional support, growth and career opportunities, and state-of-the-art facilities Dr. Laps would enjoy under Dr. Chou's mentorship and with Stanford's full support, such as those afforded by the Stanford Diabetes Research Center, the School of Medicine, and the broader Stanford campus.

72.    Dr. Chou also noted how well Dr. Laps worked with others and collaborated with his colleagues in the Chou Lab. Dr. Chou wrote:

I am writing to lend my strongest support to the fellowship application of Dr. Shay Laps for a JDRF Postdoctoral Fellowship. . . . Dr. Laps is an outstanding scientist—extremely smart, creative, and determined, he is posed for a highly successful independent research career. Dr. Laps will be exceptionally well-prepared for his long-term goal of becoming a leading group leader in peptide therapeutics development. Beyond his top-notch scientific abilities, Dr. Laps possesses all the additional attributes required for success in mentorship and collaboration. He has established exciting collaborations with researchers in my group and the broader Stanford community. I give Dr. Laps my highest recommendation for this fellowship application, which will be a tremendous boost for his

FIRST AMENDED COMPLAINT

career at this critical stage. I look forward to his success as an independent faculty member in the near future.

73.     Stanford detailed its institutional support for Dr. Laps' project in a separate "Resources" section of the Proposal, which noted the specific ways in which Stanford and the Chou Lab would make the three-year project viable and provide a backbone of support and resources for the project.

74.     The Proposal contained a "Budget" section that laid out Stanford's tangible support for Dr. Laps' research for the three years that followed, in order to justify the request for the JDRF to cover some amount Stanford intended to spend to support Dr. Laps' research. It did so thrice: (1) in a chart with columns for "Year 1, "Year 2," and "Year 3;" (2) in three separate sections for each of the three years, which proposed that Dr. Laps would spend 100% of his effort devoted to the project, and a budget to JDRF for each year; (3) under the "justification" section, a narrative to explain Stanford's intent to support Dr. Laps: "The minimum salary per year as calculated by Stanford School of Medicine postdoctoral office with accordance to my professional resume, is as follow[s]" and listed a salary for "2024-5"; "2025-6"; and "2027-8."

75.     Stanford was intimately involved in the Proposal, coordinating, overseeing, and approving all aspects of its completion. Dr. Laps also worked with Stanford administrators to ensure that the Proposal was consistent with Stanford's expectations and requirements, which Stanford monitored from the Office of Sponsored Research's independent access to the JDRF Proposal through JDRF's submissions portal. As a non-exhaustive list, Dr. Laps worked with a Stanford Office of Sponsored Research Managing Senior Contract & Grant Officer; the School of Medicine Office of Pediatric Education Postdoc & Student Coordinator; the School of Medicine Research Management Group's Fellowship Manager; the School of Medicine Pediatrics Department's Senior Research Finance Manager; and Ms. Murphy.

76.     Completing any application to JDRF requires at least the applicant and an administrator at the supporting institution's research office ("RO"). The applicant finalizes their side of the proposal, which is then sent to the research office administrator to review, approve, and submit to JDRF. JDRF's final Submission instructions call out, in particular, that "[i]n order for [a] submission to be considered complete, the RO must log into [the submissions portal and] approve the project budget" before clicking "the 'Submit to Breakthrough T1D' button."

FIRST AMENDED COMPLAINT

77.    On or around June 26, 2024, Dr. Laps and Stanford's RO each submitted the JDRF Proposal. The "Project Start Date" was listed as "01 March 2025" and the "Project End Date: 29 February 2028."

78.    On July 24, 2024, Dr. Laps and Dr. Chou participated in a routine Individual Development Plan Meeting to review Dr. Laps' progress in the Chou Lab to date. Dr. Chou reported that he was satisfied with Dr. Laps' research progress, integration in the Lab, and work on the JDRF application. Dr. Chou also confirmed that Dr. Laps would continue to work on the smart-insulin project for the long term, which Dr. Laps took to mean, at minimum, the three years required to complete the JDRF research for which they had applied. Dr. Chou and Dr. Laps also discussed future publication plans during the following years, and they agreed on tentative milestones for several years into the future, including Dr. Laps' participation in future conferences and publication of several articles based on Dr. Laps' research in the Chou Lab.

**E.    DR. LAPS REPORTS THE HOSTILE LAB ENVIRONMENT TO DR. CHOU, AND DR. CHOU RESPONDS BY THREATENING DR. LAPS WITH A FABRICATED TITLE IX COMPLAINT.**

79.    Notwithstanding that Dr. Laps and Dr. Chou were preparing to work together for another three years, by late July 2024, Ms. Lin's hostility toward Dr. Laps (and attendant tacit support of her conduct by Dr. Chou and Dr. Lin) had escalated to a point that Ms. Lin insisted that Dr. Laps impose on a colleague actively recovering from a serious car accident in the hospital instead of her to obtain materials to perform his research. Dr. Laps felt compelled to request that Dr. Chou address the issue as the leader of the Lab.

80.    On or around July 31, 2024, Dr. Laps wrote to Dr. Chou about Ms. Lin and Dr. Lin's conduct. Dr. Laps noted that he had sought Dr. and Ms. Lin's assistance with his materials order "but they seem[ed] less [than] happy to assist and direct[ed] me to [our colleague in the hospital]" and "[t]his is ac[]tually not the first time I am feeling [that] they [are] less [than] positive towards me, and I believe it's important to share it with you[.]" On information and belief, Dr. Chou took no steps with either Ms. Lin or Dr. Lin in response to Dr. Laps' July 31 message, Ms. Lin's repeated refusal to assist Dr. Laps (and only Dr. Laps), or any other aspect of Ms. Lin's and Dr. Lin's disparate treatment of Dr. Laps.

FIRST AMENDED COMPLAINT

81.    Notwithstanding this treatment, Dr. Laps made every effort to continue making strides in his research and offer any and all assistance he could to the Chou Lab. For example, also on or around July 31, Dr. Chou reached out to Dr. Laps and Ms. Lin to ask for CVs in support of a separate grant Dr. Chou wanted to pursue. Dr. Laps immediately provided his. By summer of 2024, Dr. Laps had achieved several unprecedented research milestones in the Chou Lab on at least two separate projects, both of which had the potential to materially advance insulin research. And Drs. Laps and Chou had just submitted the JDRF Proposal.

82.    But on August 26, 2024, Dr. Chou called Dr. Laps into his office for an "urgent" meeting. Dr. Chou told Dr. Laps that the Stanford Title IX office had notified Dr. Chou that a serious complaint of sexual harassment had been made against Dr. Laps and that a Title IX investigation into Dr. Laps was now ongoing. Dr. Chou purported to read from a complaint, and told Dr. Laps that Stanford's Title IX office had asked Dr. Chou to convene this meeting with Dr. Laps to inform Dr. Laps of these extremely serious allegations.

83.    Horrified, Dr. Laps asked Dr. Chou who had made the complaint, and Dr. Chou named an individual, Jane Roe,[12] an undergraduate student mentored by Dr. Babajide Ojo—a friend of Ms. Lin's—and his boss, Professor Michael Rosen. Dr. Chou then pressed Dr. Laps to, in Dr. Chou's words, "resign quietly." Dr. Chou was well aware that a complaint—including and perhaps especially a false complaint—of sexual harassment could ruin an academic's career. On information and belief, the main purpose of the meeting was not actually to notify Dr. Laps of an investigation, but rather to attempt to hastily push Dr. Laps off campus and prevent further inquiry into wrongdoing at the Chou Lab.

84.    Dr. Chou told Dr. Laps that Dr. Laps' postdoctoral appointment could be terminated and instructed Dr. Laps that he should leave the Chou Lab immediately while it was still possible to save Dr. Laps' reputation. Dr. Chou encouraged Dr. Laps to elude investigation and explicitly threatened Dr. Laps' immigration status, telling Dr. Laps that he could lose his research scholarship visa, and with it, lawful immigration status in the U.S. if he tried to stay at Stanford. Dr. Chou's message amounted to an

---

[12] This individual's name has been anonymized in an abundance of caution. Dr. Chou, Stanford, and Dr. Laps are all aware of the individual's full name.

FIRST AMENDED COMPLAINT

unambiguous missive to Dr. Laps: if you want to save your career, you have no choice but to leave the country immediately. Dr. Chou also tried positive incentives, assuring Dr. Laps that Dr. Chou would provide a strong letter of recommendation and call upon Dr. Chou's network to place Dr. Laps in a lab in China to continue his research.

85. Dr. Laps was completely aghast by the alleged harassment complaint and by Dr. Chou's instructions. The eldest brother to three sisters, Dr. Laps has identified as a feminist since childhood and considers himself a product of strong women he admires. Dr. Laps was confident he had done nothing wrong, but even so, he was deeply distressed to be accused of something he considered so awful. For all of these reasons, Dr. Laps was even more appalled by Dr. Chou's insistence that Dr. Laps should attempt to flee scrutiny and cover anything up. Dr. Laps believed that if such an accusation had been made, it had to be taken extremely seriously and fully investigated. When Dr. Laps told Dr. Chou that he believed covering up such a matter was wrong and that it ought to be thoroughly investigated, Dr. Chou was shocked. Dr. Chou's only response was an incredulous "what?!"

86. As it turned out, *there was no such Title IX Complaint from Ms. Roe,* and no one asked Dr. Chou to convene such a meeting, all of which Stanford's head Title IX officer would later confirm to Dr. Laps and Dr. Chou in writing. (*See infra* Part F.2.)

87. Dr. Laps came to realize he was being set up by Dr. Chou and others. Indeed, the meeting with Dr. Chou caused Dr. Laps to realize that a perplexing encounter two weeks before was part of chain of bizarre events intended to result in running Dr. Laps out of Stanford.

88. On August 14, 2024, Dr. Laps had walked out to the Chou Lab's building lobby to make a cup of coffee while waiting for an experiment to conclude. He sat down in the public waiting area, in view of a noticeable security camera. He was approached by an undergraduate, Ms. Jane Roe, who struck up conversation. Unprompted and while standing at a distance from a seated Dr. Laps, she began peppering him with questions about his Judaism, religious observance, and life in Israel. Dr. Laps found the subject and personal nature of the questions odd, but socially awkward undergraduates are not uncommon at Stanford. So Dr. Laps engaged politely. Ms. Roe reminded Dr. Laps of his younger sisters. But Dr. Laps then noticed a Stanford instructor, Dr. Babajide Ojo, was watching the conversation from a second-story overlook. Ms. Roe seemed to peer over at Dr. Ojo as she spoke. Dr. Laps only knew Dr. Ojo insofar as

FIRST AMENDED COMPLAINT

Dr. Laps had previously noticed Dr. Ojo socializing with Ms. Lin and Ms. Lin's Palestinian activist friend who had shunned Dr. Laps when he arrived.

89.     After over half an hour, Dr. Laps attempted to end the conversation, but Ms. Roe went on talking. He tried to end the conversation several times, even offering to continue it at a later time, with no luck. Eventually, Dr. Laps insisted that he had to get back to his experiment and walked away as politely as he could while Ms. Roe continued to speak. Dr. Laps went back to his work. But Dr. Ojo, whom Dr. Laps had never had a conversation with before, tailed Dr. Laps into the Lab and asked to speak urgently, which was overheard. Dr. Laps followed Dr. Ojo out of the Lab, where Dr. Ojo began aggressively leveling accusations against Dr. Laps. He told Dr. Laps he "heard" from an unidentified third party that there had been a conversation between Dr. Laps and Ms. Roe, in which Dr. Ojo claimed that Dr. Laps was harassing Ms. Roe, in violation of Stanford rules. Dr. Ojo's demeanor and tone were intimidating.

90.     Dr. Laps was shaken, but baffled. Dr. Laps asked Dr. Ojo if Ms. Roe had told Dr. Ojo that something inappropriate had happened. Dr. Ojo said no and insisted that he hadn't spoken to Ms. Roe at all, and didn't know anything about the content of the conversation. Dr. Ojo said he had "heard it from someone"—a third party he didn't name. Nevertheless, Dr. Ojo volunteered—without Dr. Laps asking— that, though Dr. Ojo didn't know, an official complaint could be filed against Dr. Laps. Dr. Ojo said he did not want to put Dr. Laps "in the spotlight" (a comment Dr. Laps still doesn't understand). Dr. Ojo further insisted he would speak with Ms. Roe about the matter to gain clarity, though Dr. Laps did not ask him to do that either. Another researcher from a nearby lab overheard the conversation and never spoke to Dr. Laps again.

91.     None of this made any sense to Dr. Laps. The entire interaction between Dr. Laps and Ms. Roe occurred in full view of at least one security camera, and per Dr. Ojo, Ms. Roe had not spoken to Dr. Ojo about it at all.[13] Dr. Laps was mostly just confused. The next day, Dr. Ojo passed Dr. Laps in

---

[13] Dr. Laps has made several requests to Stanford to provide the video footage of the interaction between Ms. Roe and Dr. Laps. Stanford has not provided it.

FIRST AMENDED COMPLAINT

a hallway, flashing a smile and a thumbs up. Still confused, and wanting to maintain distance from Dr. Ojo, Dr. Laps did not ask him what the "thumbs up" meant or speak with him any further.

92.    But when, two weeks later, Dr. Chou urgently insisted that Dr. Laps flee a Title IX investigation, the pieces fell into place. Dr. Laps sensed someone appeared to be manufacturing a threat against him. He was (unfortunately) proven right. (*See infra* Part F.2.)

## F.    DR. LAPS SEEKS OBJECTIVE INVESTIGATION, AND STANFORD AND DR. CHOU RESPOND WITH FURTHER RETALIATION.

93.    Dr. Laps needed to figure out what was going on. Believing that sunlight is the best disinfectant, Dr. Laps took every step he could think of to prompt a legitimate, and what he assumed would be a transparent and objective, investigation of events. The same day as Dr. Chou's "urgent" meeting, August 26, 2024, Dr. Laps reached out to the Stanford SHARE Title IX Office to ask for more information. On August 28, Miranda Tuttle, Outreach and Student Resources Manager of the Stanford SHARE Title IX Office, offered to set up a meeting. Dr. Laps followed up several times to schedule it as soon as possible.

### 1.    *Dr. Laps Reports Discrimination to Stanford's Protected Harm Identity System, Dean of the Stanford School of Medicine, and the Stanford Subcommittee.*

94.    Notwithstanding his concerns around the culture of antisemitism and anti-Israeli bias at Stanford and retaliation against those who tried to confront it, Dr. Laps believed integrity would prevail if the matter was investigated thoroughly as the law required. On or around September 2, 2024, Dr. Laps submitted three substantively similar complaints that he believed he was being discriminated against on the basis of his Jewish and Israeli identities: one using Stanford's Protected Identity Harm ("PIH") system, a second via letter to Dean of the Stanford School of Medicine, Dr. Lloyd B. Minor ("Dean Minor"), and a third to the Stanford Subcommittee on Antisemitism and Anti-Israeli Bias (the "Discrimination Complaints"). Dr. Laps had looked up the proper means of reporting such a claim, and had understood that discrimination in the lab had to be reported to Dean Minor, and discrimination outside of the lab ought

FIRST AMENDED COMPLAINT

to be reported using the PIH system.[14] To avoid any possibility that his complaint would be misrouted, Dr. Laps did both, and added the Antisemitism Committee to be triply sure the complaint wouldn't get buried.

95.     The Discrimination Complaints started by noting the unprecedented research milestones achievements Dr. Laps had made in the Chou Lab, the transformational potential of his research, and that he and Dr. Chou had sought the support of JDRF together. Dr. Laps then detailed that he was being falsely accused of a violation of Title IX "to remove me from [Stanford] and harm my promotion [in the profession] for the rest of my life[.]" The complaints explained that Dr. Laps believed he was being targeted because of his Jewish and Israeli identity, that he felt intimidated, and that he needed Stanford to contact him about its investigation. Dr. Laps also noted the extreme situation facing Jews and Israelis on US campuses post-October 7, 2023, and that it was becoming normal for protesters to call for the removal or boycott of anyone on their campuses affiliated in any way with the state of Israel or Judaism, regardless of the individual's area of research or even their political point of view. He then explained what he had dealt with in the Chou Lab in particular. He catalogued Ms. Lin's treatment, the delays to his research that resulted from her refusal to support him as she did all other members of the lab, and that she seemed to be encouraging others to obstruct his success at Stanford. Dr. Laps also described the event with Ms. Roe and his interactions with Dr. Ojo, and encouraged Stanford to investigate. He even pointed out which security camera would have relevant footage and when. And he explained what he believed was really going on: that all of these events appeared to thread together in an attempt to push him out of Stanford merely for being Jewish and Israeli, via an outlandish scheme to fabricate a false Title IX complaint against him.

---

[14] Per the Antisemitism Report, the PIH process was highly ineffective and considered campus-wide to be ineffective. On information and belief, including that noted in the Report, Stanford had a pattern and practice of ignoring antisemitism and anti-Israeli bias reported by PIH complainants. At the same time, horrifyingly, antisemitism and anti-Israeli bias were the most common incidents reported to Stanford via the PIH system. According to the Report, "the lack of transparency and accountability in [the PIH] system eroded trust in it" across campus and revealed an "apparent [official Stanford administration] attitude of 'Jewish complaints don't count[.]'" Stanford overhauled it just after Dr. Laps' submission, between or around September 13, 2024 and September 17, 2024. It was replaced with a Title VI process.

96.     Dr. Laps noted in his Discrimination Complaints that he could not possibly know all of the information that might shed light on Ms. Lin's motives, but that he had observed her social ties to pro-Palestinian and South African activists supporting claims that Israel was committing genocide. He posited his belief that antisemitic and anti-Israeli bias was her motivation. He explained that there was no other conceivable "personal or other reason" for her hostility, especially since it had manifested before Dr. Laps had so much as introduced himself to her. The Discrimination Complaints begged Stanford "to investigate by all means[,] and thoroughly[,] the mentioned above manifestations of antisemitism for the sake of my professional future which is at risk, and for [my] right to conduct clean and professional research in this respected and prestigious institution I had been called to from the other side of the world."

97.     Aside from a referral to some campus resources, Dr. Laps received no substantive guidance or response to his complaint, and no information about an investigation. After approximately one month had passed, Dr. Laps followed up on the letter he sent to Dean Minor on September 30, 2024, requesting that Dean Minor "kindly confirm" that his September 2 letter had been received.

### 2.     *The Title IX Office Confirms There is No Genuine Complaint and No Investigation.*

98.     On September 9, Dr. Laps met with Ms. Tuttle, Outreach and Student Resources Manager of the Stanford SHARE Title IX Office. Ms. Tuttle confirmed to Dr. Laps that she absolutely had not directed Dr. Chou to have any meeting with Dr. Laps, had in fact had no communication with Dr. Chou about the matter, and that the plainly fictional ruse was not, in any event, how the Title IX office worked. Ms. Tuttle also clarified that her office had received nothing from Ms. Roe about Dr. Laps and that no formal complaint about Dr. Laps or his conduct had been made at any time.

99.     Ms. Tuttle also informed Dr. Laps that, not only would she confirm this information in writing, she would also copy Dr. Chou so that he was fully advised. She did so, sending an email to Dr. Laps and Dr. Chou stating that: (1) the SHARE Title IX Office had never received a formal complaint about Dr. Laps or his conduct; (2) Dr. Laps was not under investigation; (3) Dr. Laps would be notified if any such complaint was ever received; and (4) Dr. Laps had never been found to have violated any Stanford policy and remained in good standing as he always had been. Tuttle's confirmation also included an express warning to Dr. Chou and the university: that Dr. Laps was protected from retaliation and intimidation going forward.

FIRST AMENDED COMPLAINT

100.    Ms. Tuttle shed light on what had actually happened. She told Dr. Laps that Ms. Roe had *not* made a complaint at all, as Dr. Chou had claimed, and neither had her supervisor Dr. Rosen. Ms. Tuttle advised Dr. Laps that Ms. Roe had not made a complaint against Dr. Laps in any form; someone else had emailed the Title IX office to claim Dr. Laps had violated Stanford rules, *without any complaint from Ms. Roe.* When Dr. Laps asked Ms. Tuttle to share who had made the "complaint" to the Title IX Office, Ms. Tuttle said she could not name the individual. But given that Dr. Chou came to Dr. Laps with this "report," from which he purported to read before encouraging Dr. Laps to flee the country, Dr. Chou was apparently involved with the scheme. The Title IX office saw it for what it was: baseless, and closed the matter. Dr. Rosen, however, proceeded to smear Dr. Laps to others at Stanford.

101.    Dr. Chou never discussed the Title IX issue with Dr. Laps again. Dr. Chou never acknowledged that he may have been mistaken, and never apologized to Dr. Laps for misleading him. Instead, Dr. Chou ignored the entire episode, including Ms. Tuttle's email and warning not to retaliate.

**3.    *After a Month, Stanford Responds to Dr. Laps' Discrimination Complaints, But Purports Not to Know How to Handle Dr. Laps' Complaint At All.***

102.    On October 1, 2024, Dr. Laps finally received a substantive response to his Discrimination Complaints. Ellen Waxman, the Stanford School of Medicine Senior Director of Faculty Relations in Vice Dean Boxer's office, responded to Dr. Laps' letter to Dean Minor. Ms. Waxman noted: "I understand from the Title IX office that no such complaint was filed and that they advised you of that fact." She wrote that she had understood that Dr. Laps did not want further action taken with respect to the specious Title IX complaint. As to the complaint about discrimination in the Chou Lab, Ms. Waxman explained that she had requested one of Stanford's Employee Relations staff reach out to Dr. Laps to discuss an investigation, but that apparently had not occurred. Ms. Waxman initiated an investigation, to be handled by Dawn Freeman (a senior Managing Partner of the Stanford Employee & Labor Relations department), and advised Dr. Laps to expect a letter advising him of investigation procedures.

103.    Dr. Laps responded to correct Ms. Waxman's misunderstanding and clarify that—even though Stanford had determined that there was no continuing Title IX issue—Dr. Laps disagreed that the matter was resolved, and believed that the university could not ignore investigating whether the Title IX claim was trumped up to tarnish Dr. Laps' career, and harm Dr. Laps personally.

FIRST AMENDED COMPLAINT

104.    But even Ms. Waxman was unsure what the right step was. On October 2, she told Dr. Laps she was "still figuring out the proper path for investigation," and that he should consider filing a Title VI claim using the new process that replaced the PIH process. On October 14, Ms. Waxman advised Dr. Laps that, in fact, Title VI would *not* apply to him, and returned to the original plan—investigation by Ms. Freeman through the School of Medicine's Labor and Employee Relations department. Though antisemitism and anti-Israeli bias made up the bulk of bias complaints to Stanford at the time,[15] Stanford appeared still to have no clear process whatsoever for addressing those issues. Stanford's failure on this score is wholly consistent with—and, in fact, directly evidences—Stanford's pattern and practice of ignoring, avoiding, and pretextually blowing off complaints about antisemitism and anti-Israeli conduct on campus noted in the Report.

### 4.    *Stanford Opens an Investigation into Discrimination, and Dr. Chou Retaliates by Firing Dr. Laps, Locking Him Out of the Lab, Attempting to Create a False Record, and Defaming Dr. Laps to Colleagues.*

105.    On October 15, 2024, six weeks after he had sent the Discrimination Complaints, Dr. Laps finally received an official letter from Vice Dean of the Stanford School of Medicine, Dr. Linda Boxer, opening an official investigation into his claims of discrimination.

106.    What Stanford did intend to investigate was narrow. The Boxer letter laid out just three areas of inquiry to be investigated by Ms. Freeman: (1) the "facts and circumstances regarding whether" Dr. Ojo's treatment of Dr. Laps was discriminatory or hostile "based on religion/race"; (2) the "facts and circumstances regarding whether" Ms. Lin's treatment of Dr. Laps was discriminatory or hostile "based on religion/race"; and (3) whether those "facts and circumstances" constituted a violation of University policies. There was no mention of Dr. Chou's "urgent" meeting that prompted the entire complaint, the threat to Dr. Laps' immigration status, or of Dr. Laps' national origin (or the obvious connection between Dr. Laps' national origin and his religion) despite the fact that Dr. Laps had gone to great lengths to explain the connection and post-October 7 context, including attempts to bully Israeli academics off United States

---

[15] Per the report, 69 PIH reports of 112 total in the Fall quarter of 2023 reported antisemitism or anti-Israel bias, and 16 of 34 in the Winter quarter of 2024. Report at 86.

COHEN WILLIAMS LLP

campuses, in his Discrimination Complaints. Vice Dean Boxer's letter also did not address or explain the reason for Stanford's six-week delay in beginning an investigation.

107.    On October 16, 2024, one day after the investigation was opened, Dr. Chou presented work from the Chou Lab that relied substantially on Dr. Laps' research with a physical poster depicting the results. Though Dr. Chou credited a Stanford PhD student and himself, Dr. Chou did not attribute the research to Dr. Laps or give Dr. Laps any credit. This was a profound breach of academic integrity and ethical standards in any discipline, and plainly denied Dr. Laps the very credit upon which his career success rested. Omitting attribution to Dr. Laps was particularly concerning in light of the extremely valuable patent potential of Dr. Laps' area of research.

108.    On October 23, 2024, eight days after the investigation was opened, Dr. Chou finally wrote to Dr. Laps about Ms. Lin's assays, and separately wrote to the Stanford administration about Dr. Laps. On information and belief, both were attempts to create a misleading record favorable to Dr. Chou and to undermine Dr. Laps' complaints.

109.    In his October 23 email to Dr. Laps, Dr. Chou admitted, as he had to, that Ms. Lin's assays were in "error" and "mishandle[ed]." But Dr. Chou brushed the event off, said "that particular error won't make an impact," and told Dr. Laps to "discuss with Phil [Lin]" if Dr. Laps had "further concerns." Dr. Chou did not state that he had confirmed, or even had reason to believe, that the tampering was a mistake and unintentional. Dr. Chou didn't use Ms. Lin's name at all, but made clear that Dr. Chou considered the matter closed. The email also attempted to dismiss Ms. Lin's generally hostile conduct toward Dr. Laps as harmless, writing that he disagreed that the "LSRP in the lab was not acting respectfully." Having decided there was no problem, Dr. Chou wrote, "I hope every lab member can act in a professional manner at work[,]" and left the entire matter of discrimination at that.

110.    Dr. Chou knew at the time that there was an open, legally mandated investigation into whether Dr. Laps was being discriminated against in his lab, and that Ms. Lin had tampered with Dr. Laps' research and frustrated his work repeatedly. Nevertheless, Dr. Chou never investigated how Ms. Lin had tampered with the assays, or why. There were specific tests Dr. Chou could have performed that would have shed light on whether the tampering was deliberate. But Dr. Chou declined to perform them or take any steps that may have indicated that Ms. Lin was deliberately interfering with Dr. Laps' research. On

FIRST AMENDED COMPLAINT

information and belief, Dr. Chou never attributed any responsibility for the error, took no steps with Ms. Lin to address the likelihood of an error in the future or the cause of the error to begin with, and never addressed the fact that there could have been career-ending consequences for Dr. Laps.

111. Two days later, and ten days after Stanford opened its investigation into whether Dr Laps was being discriminated against in the Chou Lab, Dr. Chou pushed Dr. Laps out entirely. At 10:19 a.m. on October 25, 2024, Dr. Chou messaged the entire Lab to inform them that he was scheduling an interview for a postdoc candidate. At the time, the Chou Lab was full and had no space, much less an opening, for another postdoc. Dr. Laps understood, as would all members of the Lab, that Dr. Chou was publicly alerting the Lab someone was about to be fired. One minute later, at 10:20 a.m., Dr. Chou messaged Dr. Laps to ask him schedule a same-day meeting for the two of them.

112. Dr. Chou began the meeting by telling Dr. Laps that Dr. Laps was "a terrific postdoc" and "an amazing scientist." Dr. Chou also told Dr. Laps that he was aware that Dr. Laps had filed a discrimination complaint about antisemitism and anti-Israeli bias in the Chou Lab. Dr. Chou brushed off that investigation and told Dr. Laps it would find nothing, and then Dr. Chou told Dr. Laps that Dr. Laps' expertise in peptide chemistry would nevertheless be a better "fit" at a different lab. He added that Dr. Laps could not, however, find a fitting lab in the entire Bay Area and would be wasting his time to try. Dr. Chou directed Dr. Laps to immediately stop his research, and divert all of Dr. Laps' attention to finding another lab so that Dr. Laps could move there as soon as possible. Dr. Chou again threatened Dr. Laps with immigration consequences, telling Dr. Laps he would have to leave the country given that Dr. Chou had just terminated his postdoc, and with it, Dr. Laps' lawful immigration status. Dr. Chou cited no basis whatsoever for terminating Dr. Laps. When Dr. Laps asked about another lab at Stanford, Dr. Chou insisted that there was no chance whatsoever that Dr. Laps would find a place in any other lab at Stanford and pushed Dr. Laps to instead seek a lab out of the country, particularly in China. Dr. Chou even identified a specific lab at Stanford, that of Dr. Matthew Bogyo, to explain to Dr. Laps how and why he had no chance of working there.

113. Dr. Laps told Dr. Chou during this meeting that Dr. Laps was surprised, and had understood that Dr. Chou had made a long-term commitment to work with Dr. Laps for at least the three years required for the JDRF project. Dr. Laps also made it clear that he did not agree with Dr. Chou's statements that

FIRST AMENDED COMPLAINT

Dr. Laps' expertise in peptide chemistry was not aligned with the Chou Lab's needs and research. Dr. Chou ended the meeting with the unmistakable impression that their professional and employment relationship was over, that Dr. Laps would soon lose his lawful immigration status, and that Dr. Laps could work out any other necessary logistics with Margaret Murphy.

114. Shortly after their discussion and on the same day, Dr. Chou emailed Dr. Laps and untruthfully asserted that they had "agree[d] that a more peptide chemistry-oriented lab is more suitable for [Dr. Laps'] future career success" and that Dr. Chou would be transitioning Dr. Laps to another lab. Dr. Chou added that he would be "happy to provide a reference letter and talk to prospective [principle investigators] about [Dr. Laps'] strength in peptide chemistry."

115. Dr. Chou's claims were demonstrably false. Dr. Chou had just told JDRF in the Proposal that his lab had specialized resources to support Dr. Laps' "peptide chemistry-oriented" research and future career success into 2028. And Dr. Chou actively markets his lab as being oriented to "peptide chemistry" to this day.[16] Dr. Laps had certainly never "agreed" another lab would be more "suitable," as Dr. Chou falsely represented.

116. Dr. Laps responded the following day, cc'ing the Office of the Stanford President, carefully and respectfully refuting Dr. Chou's assertions with the verifiable facts. Dr. Laps pointed out that Dr. Chou's conduct was retaliatory given that Dr. Laps had joined Dr. Chou's lab based on his commitment to support his research for years to come, demonstrated in their written communications, orally during interviews before Dr. Laps joined the Lab, again during preliminary examination procedures, in the JDRF Proposal, and during their July 24, 2024 Individual Development Plan meeting. Dr. Laps pointed out that he had been subject to hostility in the Chou Lab, and "to my astonishment [Dr. Chou] avoided dealing with them." Dr. Laps pointed out it was scientifically, logically, and facially untrue that Dr. Laps was not a fit for the Chou Lab, which was evident from Dr. Chou's offer for Dr. Laps to join the Lab to begin with and from their JDRF Proposal. Dr. Laps noted that the real reason for his termination appeared to be his Jewish and Israeli identity. Dr. Laps reiterated that he remained committed to complete

---

[16] Danny Chou Lab at Stanford, Research, http://www.dannychoulab.com/research.html [https://perma.cc/XML9-LWPT].

FIRST AMENDED COMPLAINT

the long-term research agreement between them and that Dr. Laps had already invested money, resources, and declined other offers to pursue the opportunity with the Chou Lab. Dr. Laps noted the extreme distress Dr. Chou's behavior and the environment in the lab had caused him, and firmly rejected the attempt to terminate his position in the Lab. Given the untenable situation, Dr. Laps requested that Dr. Chou affirmatively find an alternative that left Dr. Laps no worse off. Dr. Laps was at all times professional. He used no invective, expletives, or even exclamation points. He made no ad hominem attacks. All Dr. Laps did was point out Dr. Chou was incorrect and that what had gone on in the Lab was inappropriate, forwarding his positions, and insisting upon fair treatment and his rights under the law.

117.    Dr. Chou responded by immediately deactivating Dr. Laps' badge access and locking Dr. Laps out of the Chou Lab. Dr. Laps' postdoc seemed effectively over.

118.    Dr. Chou replied on October 28. He addressed none of the facts Dr. Laps pointed out. He instead blamed Dr. Laps and pivoted to a fabricated excuse to bar Dr. Laps from the Chou Lab, asserting that Dr. Laps would have to "work from home this week for safety reasons."[17] Dr. Chou didn't name those reasons, had never mentioned any before, nor has he since. Dr. Chou continued: "You have a lot to sort through, and your email gave me concerns about your ability to be in the lab and be professional with the team. Please use the time to think about a plan for how we can finish your ongoing work in the lab for publication before you transfer." Nor would Dr. Chou assist; he merely referred Dr. Laps to Margaret Murphy, Stanford School of Medicine Department of Pediatrics Associate Director of Postdocs and Students.

119.    Chemists cannot complete their research without the ability and resources to perform chemistry. They cannot effectively "work from home" without a lab, materials, a safe environment, and research support.

---

[17] The Report had put Stanford on specific notice that calling Jews and Israelis a threat to "safety" merely for existing in a space while being Jewish and/or Israeli is a known tactic to deny them the same rights and privileges of others on campus and get away with discriminating against them. Dr. Chou has never provided evidence of any "safety" issue.

120. All of Dr. Chou's conduct constituted retaliation while Dr. Chou was aware an investigation into discrimination in the Chou Lab was ongoing, notwithstanding that Dr. Chou had been expressly warned not to retaliate.

121. Dr. Laps later learned that, during this time and on or before November 4, 2024, Stanford colleagues had inquired with Dr. Chou about why Dr. Laps was suddenly absent from the Chou Lab. Dr. Chou told at least one Stanford researcher that Dr. Laps' absence was due to a "legal licensing" issue with Dr. Laps' work and that Dr. Laps would not be returning, as if it was Dr. Laps who had violated the law and not Dr. Chou. There has never been any "legal licensing" issue with Dr. Laps' work, or even a claim of such an issue. Dr. Chou knew or should have known that this was a lie at the time he said it that would be detrimental to Dr. Laps' professional reputation.

122. Dr. Chou did not at any point reverse his unlawful decision to terminate Dr. Laps' postdoc and rescind his support for Dr. Laps' continuing research at Stanford.

### 5. *Dr. Laps Repeatedly Puts Stanford on Further Notice of Discrimination and Retaliation; Stanford Puts Off Investigation, and Emboldens Dr. Chou.*

123. On October 30, 2024 Dr. Laps forwarded Dr. Chou's October 25 and 28 messages to the Office of Stanford President Jonathan Levin, Dean Minor, Ms. Murphy, Ms. Waxman, Ms. Freeman, the Stanford Subcommittee on Antisemitism and Anti-Israeli Bias, Vice Provost for Institutional Equity, Access & Community Patrick Dunkley, Ms. Tuttle, and other Stanford administrators. Dr. Laps noted that Dr. Chou had requested that Dr. Laps stop his research, stop coming into the Chou Lab, and move immediately.

124. The Stanford administrators on the chain were responsible for investigating claims of unlawful retaliation. Nevertheless, Stanford did not open any investigation into the retaliation Dr. Laps was suffering. As a direct result, the retaliation worsened significantly.

125. Around this time, on or around November 2024, Dr. Laps attended a dinner at Stanford Hillel to feel part of his community given his extreme distress in this environment of intimidation. The wife of a fellow Israeli graduate living in Stanford housing told Dr. Laps about how someone kept putting a sign reading "Murderer" on their door, and that no matter how many times she took the sign down,

FIRST AMENDED COMPLAINT

someone kept putting up another. She and Dr. Laps lamented their common situation; she recounted how she reached out to Stanford for support only to have the administration do nothing.

126. Stanford initially attempted to save face and paper over Dr. Chou's treatment of Dr. Laps to avoid an investigation. A non-legal "mediation" was arranged between Dr. Laps and Dr. Chou, conducted by a licensed clinical social worker and Director of Stanford's Faculty Staff Help Center,[18] Rosan Gomperts. The meeting was conducted on November 12, 2024, two and a half weeks after Dr. Laps had been locked out of the Lab and after Dr. Laps confirmed that Dr. Chou was actively defaming Dr. Laps. It resulted in Dr. Chou agreeing that Dr. Laps had to be allowed back into the Chou Lab to resume his research. Dr. Chou also agreed to assist Dr. Laps in publishing Dr. Laps' research in a prestigious scientific journal. Dr. Chou did not raise, or, in fact, even mention, a "safety" concern or complaint regarding Dr. Laps. Dr. Laps attempted to raise the issue of his long-term future at Stanford, and Dr. Chou's decision to rescind support for Dr. Laps' postdoc, but Gomperts refused to discuss it.

127. Dr. Laps had every intention to continue the research Dr. Chou had promised in the meeting to allow Dr. Laps to continue. On November 12, Dr. Chou confirmed that shared intention in writing, asking Dr. Laps for a "list of proposed experiments [he] would like to do by the end of January" and saying "I encourage you to keep thinking about key experiments" and purporting to "look forward" to Dr. Laps' return to the Lab to "discuss the specific set of experiments when you are ready." Dr. Chou also undermined the reasons underpinning his prior fictitious "safety" claims, acknowledging that it was *Dr. Laps* who was unsafe, writing: "I will address the situation with the lab and make sure that you can return to work next week and feel safe to work…."

128. On November 18, twenty-four days after Dr. Chou attempted to terminate Dr. Laps' postdoc and lock Dr. Laps out of the Lab, Dr. Laps' access was reinstated. Losing three weeks was a blow to Dr. Laps' research and productivity, and Dr. Laps was anxious to make up for what lost time he could.

129. But Dr. Chou reneged on his commitments immediately, and Stanford did nothing to stop him. When Dr. Laps showed up to the Chou Lab on November 18, Dr. Chou informed Dr. Laps that

---

[18] The Stanford Faculty Help Center provides counseling and "facilitated conversations" by psychologists, social workers, and therapists.

FIRST AMENDED COMPLAINT

Dr. Laps would *not* be permitted to resume his research as they had agreed, and instead that Dr. Laps would only be permitted to use the Chou Lab to type up results of prior research. Dr. Chou not only refused Dr. Laps' request to continue progress on his own research, Dr. Chou also declined Dr. Laps' request to help others in the Chou Lab in their research endeavors.

130. Dr. Laps is informed and believes that Stanford has claimed that support for Dr. Laps' postdoc and further research was justifiably revoked due to Dr. Laps' failure to show progress in the Chou Lab before Dr. Chou booted him. This is patently untrue. Dr. Laps had submitted weekly reports to Dr. Chou on his considerable research progress. Dr. Chou never claimed that Dr. Laps had failed to make sufficient progress, or that his work required improvement. Dr. Chou only ever expressed satisfaction with Dr. Laps' work. Indeed, Dr. Chou had been so impressed with Dr. Laps' work in the Chou Lab that, on or around September 2024, Dr. Chou asked Dr. Laps to present Dr. Laps' astounding research progress to the Metabolism Excellence Group, a research group within the renowned Stanford Chemistry Engineering & Medicine for Human Health (ChEM-H) institute directed by chemistry Nobel laureate Professor Caroline Bertozzi. When Dr. Laps showed Dr. Chou his presentation for the event, Dr. Chou lauded it as "outstanding" and encouraged Dr. Laps to (i) remind the group that Dr. Laps had achieved these milestones despite having only been at Stanford for less than six months; and (ii) include *fewer* of Dr. Laps' achievements because the group of some of the world's most talented scientists might have trouble understanding.

131. Aside from the research progress Dr. Laps had made, not to mention that Dr. Chou later actively barred Dr. Laps from making further progress, Dr. Chou attested to the progress Dr. Laps had made in the Chou Lab on Stanford Medicine letterhead. On November 21, 2024, Dr. Chou called Dr. Laps "exceptional," his contributions to the Lab "significant," his expertise "remarkable." Dr. Chou wrote:

    a. "During his time in my lab, Dr. Laps has proven to be an exceptional scientist with remarkable expertise in peptide chemistry. Dr. Laps has demonstrated a deep knowledge of solid-phase peptide synthesis (SPPS) techniques and has tackled highly challenging peptide sequences with skill and precision. His ability to troubleshoot and optimize protocols has significantly contributed to our research progress. He has also shown great perseverance and creativity in overcoming the complexities of peptide synthesis, which

FIRST AMENDED COMPLAINT

underscores his technical acumen and innovative approach. Furthermore, his extensive training in various aspects of peptide chemistry is a rare asset."

b.  "Dr. Laps has demonstrated significant contributions to the field of chemical biology already in the early stage of his career."

c.  About Dr. Laps' "excellent PhD," "prestigious" awards, that he was "published as a first author five papers in very prestigious scientific journals," about Dr. Laps' "develop[ment of] an innovative approach to creating peptides and proteins . . . tackling an important challenge in the field" on an area "of great interest because of its important role in therapeutic peptides and proteins (e.g., Insulin)," and about Dr. Laps' other medically relevant achievements and findings, which Dr. Chou described as "important regarding the global efforts to handle the problem of bacterial resistance to conventional antibiotics."

d.  Dr. Laps' "experiences make him an expert protein chemist and chemical biologist" with "an excellent academic profile."

e.  "The breadth of [Dr. Laps'] work really showcases his ability to apply his skills to different scientific fields."

f.  "Beyond his technical skills, Dr. Laps has been an active and engaged member of our research group" and had "enhanced the intellectual atmosphere of [the Lab's] discussions and helped other team members refine their projects."

g.  "[Dr. Laps'] collaborative spirit and ability to provide constructive feedback make him a valued colleague."

h.  "[Dr. Laps'] dedication, expertise, and collegiality ensure his future success in peptide, protein chemistry and beyond."

132.    Stanford still declined to open an investigation into retaliation. Rather, it attempted to prune its investigation of Dr. Laps' discrimination claims to leave out large amounts of relevant facts, documentation, interested parties, and other proof. Concerned with the possibility Stanford would blind itself from relevant information to reach a predetermined conclusion, on December 8, 2024, Dr. Laps provided Stanford administrators with an incredibly clear articulation of the relevant evidence and facts that required investigation to make it impossible for them to ignore. In an eleven-page letter to Dawn

FIRST AMENDED COMPLAINT

Freeman, who was responsible for the investigation, and Vice Dean Boxer, Dr. Laps implored Stanford to do an adequate investigation. Dr. Laps plainly laid out the bare minimum an investigator would need to review to adequately review his case. Among other things, the letter:

a. Made a particularized claim that Dr. Chou was engaging in unlawful "intimidation and retaliatory conduct in violation of Stanford University regulations, and federal and state law," that Dr. Chou "has allowed a hostile environment to persist in his laboratory and has promoted that hostile environment," and detailed the "multiple, documented instances of antisemitic conduct, none of which have been appropriately addressed," including Ms. Lin's interference, the Title IX claim, and Dr. Chou's involvement;

b. Noted that the three limited topics of inquiry for the discrimination investigation "are far too narrowly defined to address the problems that exist in the Chou Lab, and the highly problematic conduct directly attributable to Professor Chou" and requested that the scope be expanded to address all matters, and responsibility for his complaints consolidated;

c. Noted that events implicated Title VI and questioned Ms. Waxman's refusal to conduct a Title VI investigation, requesting further guidance;

d. Raised "the immediate threat to my visa status intentionally created by Professor Chou";

e. Asked Stanford to "identify and preserve" relevant surveillance video;

f. Detailed the multiple assurances Dr. Laps had received that he was protected from retaliation;

g. Listed specific facts demonstrating Dr. Chou's retaliation, intimidation, and repeated, verifiably false claims to justify the unlawful behavior;

h. Asserted that this unlawful conduct could prevent Dr. Laps from successfully obtaining and completing the JDRF Proposal if awarded, outlined the harm of all of these events to Dr. Laps' wellbeing, research, career and immigration status, including the risk that Dr. Chou might seek a potentially valuable patent (that would make both Dr. Chou and Stanford substantial sums of money) based on Dr. Laps' work without proper attribution, and noted that failure to resolve these issues could be irreparable;

FIRST AMENDED COMPLAINT

i.  Implored Stanford to come to some reasonable resolution that addressed the violation of Dr. Laps' civil rights and his legitimate concerns in light of the relevant events;

j.  Asked for the surveillance footage of the August 14, 2024 event with Ms. Roe, and for advice regarding Stanford's Title VI process.

133.  Despite being on notice of the violations of law Dr. Laps had suffered, deficiencies in its processes and investigations, and the availability (and indeed, Stanford's own control of) documentary proof bearing on Dr. Laps' discrimination concerns, Stanford ignored virtually every single request. Stanford did not provide the video, did not advise Dr. Laps of its Title VI process, did not expand its investigation, did not come to a reasonable resolution, and did not review or investigate all of the specific facts and proof Dr. Laps identified for Stanford. Nor did Stanford open an investigation into Dr. Laps' claim of unlawful retaliation following the December 8 letter.

134.  On information and belief and consistent with the Antisemitism Report's findings, Stanford's conduct was a deliberate attempt to eschew adequate investigation so that Stanford could claim to find no discrimination, a finding that was predetermined and not based on evidence or honest process, in order to protect the university at a time of heightened external scrutiny. (*See* ¶¶ 44, 106.)

**6.  *Dr. Chou Attempts to Rescind His Support in Further Retaliation, While Dr. Laps Wins the JDRF Fellowship.***

135.  As a result of Stanford's continued refusal to investigate and stop unlawful retaliation, that retaliation continued to get worse. On or around December 2024, Dr. Chou and Stanford sought to rescind the JDRF Proposal in retaliation for Dr. Laps claiming that his rights had been violated.

136.  On the afternoon of December 19, 2024, Dr. Laps received an email from Stanford School of Medicine Fellowship Manager Nicholas Cuisinot titled "JDRF Fellowship- Application Withdrawal Confirmation" writing: "Your Mentor, Danny Chou, informed me that you will no longer be part of his lab as of 3/31/2025. He also sent a request to remove himself as your mentor on your previously submitted JDRF application (SPO #343343) and to have the application withdrawn if necessary as well." Cuisinot requested that Dr. Laps "confirm whether both requests from Dr. Chou are correct" so that Cuisinot could notify JDRF.

137.   The next day was the Friday before Stanford closed for its annual winter break. Dr. Laps would be unable to reach anybody at Stanford, including the research management administrators, until well into the New Year. Needing time to figure out how to save one of the most meaningful steps in his career, Dr. Laps asked if the research management team could at least wait until after the break before taking irreversible action. At 9:48 a.m. on December 20, the Fellowship Manager's boss, Angela Au, Stanford School of Medicine Assistant Director of Fellowships, informed Dr. Laps that her team had "confirmed the situation with the department" and would not wait for Dr. Laps. Dr. Laps immediately requested that Stanford hold off until after winter break. Ms. Au agreed.

138.   On or around January 2, 2025, before Stanford's campus reopened, JDRF notified Dr. Laps and Ms. Au that the JDRF Proposal had been granted. Dr. Laps was awarded a fellowship grant of $94,410 per year for three years, a total of $283,230 beginning on March 1, 2025 and running through 2028 (the "Award"). JDRF set a due date for completed activation materials of February 1, 2025.

139.   Dr. Laps promptly submitted his JDRF activation materials on January 19, 2025, accepting the grant in full for all three years, and completing all necessary steps required of him to activate the grant as awarded. As with the Proposal submission, after Dr. Laps completed his portion, Stanford was responsible for finalizing activation with JDRF.

140.   Dr. Laps would later attempt to enlist the help of multiple other campus administrators to implore them to help ensure Stanford would accept the Award and allow him to conduct the JDRF research, emailing Vice Dean Boxer on January 24, 2025, the Stanford Board of Trustees on January 26, 2025 and Stanford President Jonathan Levin on January 30, 2025. All to no avail.

## G.   STANFORD COMES TO PREDETERMINED CONCLUSIONS AND RETALIATES AGAINST DR. LAPS.

### 1.   *Stanford Concludes No Discrimination Occurred, Delays Opening a Retaliation Investigation, and Pressures Dr. Laps to Rescind His Complaints.*

141.   On or around January 10, 2025, Stanford purported to conclude its investigation into Dr. Laps' initial discrimination complaints. In a letter from Vice Dean Boxer, cc'ing Ms. Waxman, Ms. Freeman, and Dr. Mary Leonard, Chairman of the Stanford School of Medicine Pediatrics Department and Member of the Stanford Diabetes Research Center, Stanford provided its official factual findings and

conclusion: "the information gathered does not support that Dr. Laps was discriminated against because he was Jewish or Israeli."

142. But the investigation findings don't mention "Israel" anywhere else, including in all of the credibility determinations, underlying facts, and underlying determinations apparently supporting its findings. On information and belief, Stanford did not investigate the question of whether Dr. Laps was discriminated against on the basis of his national origin at all.

143. According to the letter, the "information gathered" was one document, Dr. Laps' letter to Dean Minor, and interviews of Dr. Laps and "several other [unidentified] witnesses." It referenced only two witnesses by name: Dr. Ojo and Ms. Lin. It does not cite or say that it reviewed any surveillance footage. On information and belief, Stanford reviewed nothing else.

144. The letter did not address Dr. Laps' claims of retaliation, and did not indicate that Stanford was opening an investigation into that claim of retaliation.

145. The letter claimed that Dr. Ojo had said, contrary to what he told Dr. Laps immediately proximate to the event, that Ms. Roe had reported to him that "she had a concerning conversation with Dr. Laps and that Dr. Laps had asked her personal questions." Vice Dean Boxer's letter did not contain any information about Dr. Ojo's credibility or Dr. Laps' credibility. It did not compare the two on the irreconcilable fact it relied upon as dispositive, nor mention that there was objective evidence bearing on the difference. Indeed, the letter didn't mention a difference at all.

146. The investigation described in the letter was so lacking in detail, information, sources, and context that its inadequacy alone suggests its process was biased and its outcome predetermined. It found the answer it wanted by asking only the questions tailored to prompt it. This is evident from the conclusions the findings appear almost wholly based upon: "Dr. Laps did not assert that Dr. Ojo made any anti-Semitic comments and Dr. Ojo credibly stated that he did not know Dr. Laps was Jewish" and "Ms. Lin said she did not know Dr. Laps was Jewish." Both conclusions were plainly wrong and not even credible, and neither addressed the plain fact that both knew he was Israeli.

147. The letter makes clear that the investigation ignored every single issue pointed out *to* Stanford *by* Stanford in the Antisemitism Report. The Report highlighted, at length, the way antisemitism and anti-Israeli conduct is often veneered in proxy just enough to deliberately harass Jews and Israelis and

FIRST AMENDED COMPLAINT

also escape social consequences. For example: "[s]ome of this bias is expressed in overt and occasionally shocking ways, but often it is wrapped in layers of subtlety and implication, one or two steps away from blatant hate speech." By imposing a standard requiring a slur in order to find discrimination, Stanford deliberately blinded itself to whether discriminatory conduct aside from hate speech had, in fact, occurred. Stanford, including the administrators involved in the investigation of Dr. Laps' claims, did know or should have known that, under the law, a slur is not required to find discrimination occurred.

148.   Vice Dean Boxer's letter also failed to so much as acknowledge that Dr. Laps was working in a hostile environment. The Report had given a stern warning to Stanford on precisely this point: that the pattern of antisemitism and anti-Israeli bias at Stanford is "disturbing and recurrent," that antisemitism had been normalized at Stanford, and that "antisemitic acts [at Stanford] may cumulate into a 'hostile environment' that violates federal civil rights law."

149.   In the final substantive paragraph, Vice Dean Boxer cited the Title IX matter and *Terra Lin's* discomfort with Dr. Laps—which had never been noted before or even mentioned—to make a vague threat and suggest that the issue lay with Dr. Laps. This was the same Title IX matter, or non-matter, Ms. Tuttle had cautioned could not be used to retaliate against Dr. Laps. In other words, Stanford relied on the conduct Dr. Laps claimed to be discriminatory—Ms. Lin's "discomfort"—as *reason to blame* Dr. Laps. Relying on Ms. Lin's reported discomfort with Dr. Laps demonstrated the tautology problem undermining the adequacy (and predetermined nature of) the investigation: because Dr. Laps was wrong about being discriminated against, Ms. Lin was credible to the exclusion of Dr. Laps, and thus there was no discrimination. It was also retaliatory to leverage the Title IX issue to discount Dr. Laps, when the Title IX office itself had stated Dr. Laps was protected from such conduct.

150.   Stanford was obligated by its own rules, including but not limited to its Code of Conduct, and applicable law and regulations to conduct a timely, fair, honest, ethical, legally-compliant investigation of Dr. Laps' discrimination claims free of bias, misconduct, partiality, and impropriety, and to take timely and appropriate disciplinary or other remedial action to cease offending conduct, prevent recurrence, and discipline those responsible. Stanford wholly failed to do so, in violation of its own rules and applicable law. The investigation's credibility determinations and its findings were riddled with bias;

its methods were inadequate to reach a reasoned, reasonable, and competently supported conclusion—all of which was consistent with the pattern and practice identified in the Report.

151.    On January 26, 2025, Dr. Laps wrote back and identified these, and other, numerous flaws in the findings and process. He requested that the matter be reopened and properly investigated. He further asked about the process for appeal. He also sought details about the never previously mentioned claim that Ms. Lin had complained about Dr. Laps' conduct so that he could review and respond if appropriate.

152.    Stanford did not reopen the discrimination investigation, did not properly investigate it, did not address any of the errors Dr. Laps identified, and did not advise Dr. Laps regarding his right to appeal or otherwise respond to his explicit request for information on how to do so. Stanford also continued to fail to open an investigation into Dr. Laps' claims of retaliation. Stanford *never* advised Dr. Laps how to appeal or made any appeal process available to him.

153.    Thereafter, Stanford engaged in weeks of what it claimed to be settlement discussions in which Stanford repeated its bad-faith tactics through additional employees, attempting to further retaliate, and to threaten, coerce, and intimidate Dr. Laps into waiving his civil rights by rescinding his complaints and appeal request. During these discussions, Stanford indicated that it knew Dr. Laps intended to appeal. Stanford also exhibited bias and highly inappropriate behavior, including via Meagan Todaro Coffman, an Associate Director of Faculty Relations acting in an administrative capacity who possesses a law degree. Coffman remarkably threatened to reopen a Title IX investigation Stanford knew there was no valid basis for, told Dr. Laps he ought to "stop talking to young women," blamed Stanford's inability to abide its commitments to Dr. Laps' on Dr. Laps himself for having filed civil rights complaints, and seemed to attempt to bully him into signing legal documents within a matter of days while he was unrepresented by counsel. This all occurred in the presence of, and without reproach from, Dr. Klepner and Margaret Murphy.

### 2.    *Stanford Opens a Retaliation Investigation Once Forced, and Retaliates Further By Rescinding Support for the JDRF Research.*

154.    When it became clear that Dr. Laps had retained lawyers who were watching, Stanford finally reversed their months-long refusal to open an adequate investigation, and on February 18, 2025, Vice Dean Boxer sent Dr. Laps a formal Notice of Investigation and Review, listing three questions of

COHEN WILLIAMS LLP

inquiry: whether Dr. Chou retaliated by ending Dr. Laps' postdoctoral appointment as of March 31, 2025; whether Dr. Chou retaliated by refusing to support the JDRF grant for which he and Dr. Laps had applied; and whether that conduct violated Stanford policies.

155.    Immediately following this letter, Dr. Laps protested yet again that these investigation questions left out multiple relevant areas of inquiry, such as Stanford's own complicit conduct, that would be required for any adequate investigation. Stanford did not supplement its investigative questions, and went on to conduct an investigation that, on information and belief and consistent with the Report, its first biased investigation, and Dr. Laps' entire experience, had a predetermined outcome: to find nothing problematic had occurred.

156.    While its investigation was ongoing, Stanford continued to retaliate. First, prior to or around February 18, Stanford wrote to JDRF to unilaterally amend the terms of the JDRF grant. Those amendments purported to make it easier for Stanford to alert JDRF to "violations" that might prompt JDRF to rescind its support for Dr. Laps.

157.    Second, on or around February 21, Stanford submitted activation materials to JDRF "updat[ing]" the JDRF Award from three years of support to "reflect" only one year of support. Stanford's note to JDRF read: "The effort year - stipend category was updated to reflect the approved amount for [only] Year 1."

158.    Stanford deprived Dr. Laps of at least two thirds of the benefit of the JDRF grant by notifying JDRF that Stanford would not support it. Stanford attempted to create the appearance that Dr. Laps was being "offered" one year of postdoctoral appointment, but the "offer" in fact rescinded two years of the three total years of support that Stanford and Dr. Chou had repeatedly promised. But effectively, Stanford's amendment deprived Dr. Laps of the full benefit of the JDRF Award, too. One year of appointment set Dr. Laps up to fail. Stanford did not offer to take any steps to protect Dr. Laps from further discrimination or retaliation and provide an environment where he could safely conduct any research, for any period of time. And though Dr. Laps asked, Stanford refused to assist Dr. Laps in obtaining the physical and academic resources and institutional support he clearly needed from the Chou Lab were he to conduct his research successfully in any other lab. And most importantly, three years of groundbreaking research was obviously impossible to complete in just one year.

FIRST AMENDED COMPLAINT

159.    Had Dr. Laps taken a single year of support and failed to achieve three years of research milestones in that one additional year, as was impossible to do, it would have done even more damage to Dr. Laps and his career than Dr. Chou and Stanford had already inflicted. In academia generally and research science specifically, the years immediately following a scholar's PhD are the most important time in the scholar's career. Demonstrate promise early, such as with significant research findings and publications of those findings, and a scholar's professional reputation, marketability, and future opportunities skyrocket. Squander those years, and each of those things suffer, and one's academic research career can be over before it really starts. A scholar who fails to demonstrate success in the early years following their PhD becomes worse off with each passing year. This was the exact stage of Dr. Laps' career at the time. Had Dr. Laps taken a single year of support from Stanford and the JDRF Award, he would have lost an additional year of his early career, the costs of staying halfway around the world, and the professional consequences of research set up to fail. Perhaps most distressingly to Dr. Laps, he would have wasted the funds of the most prestigious and competitive grantor in his area of research to the detriment of diabetics worldwide who stand to benefit from that research and JDRF's funds. Dr. Laps would necessarily have had to explain his failure, to the extent he would even be granted an opportunity to do so by institutions, journals, and positions to which he might subsequently apply.

160.    Dr. Laps had requested that Stanford promise to provide a safety net of funding and support were JDRF to reject those terms. Stanford refused, and instead confirmed its one-year "offer" was contingent on JDRF's approval of Stanford's new unilaterally-set terms. On information and belief, Stanford knew that JDRF was likely to reject the terms Stanford proposed for Dr. Laps to use an ill-equipped lab, for 33% of the originally proposed term, without the support of the faculty member with relevant research experience. In other words, Stanford would be able to say it made "an offer," that Dr. Laps accepted it, and then be let off the hook when JDRF declined to waste its money on a project destined to fail by the new and inferior terms Stanford had set.

161.    Out of respect for the JDRF, his own work, and the millions of diabetics who stood to benefit, Dr. Laps insisted on the three years of research he applied to JDRF to conduct, that he needed to complete the project with any hope of success, and that Stanford had previously promised to support.

FIRST AMENDED COMPLAINT

162. Stanford never submitted activation materials to accept any part of the JDRF Award. On February 27, Stanford's Managing Senior Contract & Grant Officer wrote to JDRF, cc'ing Ms. Murphy and an associate director of faculty relations who demonstrated outright malice toward Dr. Laps, writing "It's come to our attention that we are no longer in a position to accept this award and must respectfully decline it." JDRF responded that this was "very unfortunate."

163. Dr. Laps grew increasingly distressed by Stanford's hostility and its discriminatory and retaliatory conduct. Ultimately, he was forced by Stanford and Dr. Chou's behavior to end his postdoc appointment abruptly due to the unlawful harassment and discrimination he experienced and Stanford justified, covered up, and refused to remedy. He did so on February 26, 2025 on or around 1:29 p.m.

164. Stanford accepted Dr. Laps' resignation at 2:45 p.m. that same day. Ms. Murphy sent him all of Stanford's "legal requirements" for ending the postdoc appointment. She confirmed that she would lock his record at 5:00 p.m., and instructed Dr. Laps to meet her in an hour and fifteen minutes to return his badge, at 4:00 p.m. that same afternoon.

165. Regarding Dr. Laps' immigration status, the only information Stanford provided was: "You may remain in the US legally on your J-1 visa for 30 days from today."

166. Ultimately, Stanford issued Dr. Laps a final paycheck that failed to include his full wages.

**3.** ***Stanford Completes Its Retaliation Investigation, Coming to Its Second Predetermined Conclusion.***

167. On April 24, 2025, Vice Dean Boxer issued a letter to Dr. Laps with Stanford's "findings of the investigation into your concerns of the retaliation in the Chou laboratory." The investigation concluded what Dr. Laps knew, and the Report warned, it would: "more likely than not that Dr. Chou's conduct did not violate a university policy."

168. Vice Dean Boxer's letter indicated that Stanford had declined to expand its fact-finding questions. The letter did not, for example, mention or address the multiple instances of retaliation by Stanford itself that Dr. Laps had repeatedly raised. On information and belief, Stanford has not opened any investigation into those matters.

169. Vice Dean Boxer's letter indicated that that the investigator—Ms. Freeman, the same as in the prior, investigation—interviewed Dr. Chou and Dr. Kleppner, (who Stanford had suggested Dr. Laps

FIRST AMENDED COMPLAINT

contact to support his mental health in light of submitting a report that he had suffered discrimination), and attempted to interview Dr. Laps, and no one else. Seven documents were used.

170. The findings concluded that Dr. Chou's failure to provide Dr. Laps attribution for his work was "oversight" (though Dr. Chou had credited an undergraduate without "oversight") and "could not substantiate" that Dr. Chou retaliated against Dr. Laps by not supporting Dr. Laps for the three years of research they applied for jointly. Although Stanford did find that Dr. Chou kicked Dr. Laps out of the Lab, it found that in doing so, Dr. Chou violated no policies because "Dr. Laps did return" later. The findings claimed, incorrectly, that Dr. Laps was "able to continue in the same position and doing the same work during that period with no material impact" and did not address Dr. Chou's refusal to let Dr. Laps use the Lab for anything other than typing, the effect of weeks of lost work on Dr. Laps' chemistry, or of being made unwelcome in the lab going forward. In the absence of addressing these critical matters, the findings letter concluded it "was not substantiated that the removal was retaliatory."

171. On information and belief, Stanford didn't find what it deliberately didn't look for, and the retaliation investigation was also flawed, rife with bias, and predetermined by administrators and an institution incentivized to cover up the antisemitism and anti-Israeli bias on its campus and wash its hands of Dr. Laps, all consistent with the pattern and practice evidenced by the Report and all of Dr. Laps' prior experiences.

172. Stanford was obligated by its own rules, including but not limited to its Code of Conduct, and applicable law and regulations to conduct a timely, fair, honest, ethical, legally-compliant investigation of Dr. Laps' retaliation claims free of bias, misconduct, partiality, and impropriety, and to take timely and appropriate disciplinary or other remedial action to cease offending conduct, prevent recurrence, and discipline those responsible. Stanford wholly failed to do so, in violation of its own rules and applicable law.

173. As just one example, the investigation found "[i]t could not be substantiated that Dr. Chou refused to co-sponsor Dr. Laps' JDRF grant/fellowship award." But—among many other pieces of proof and the incontrovertible fact that Stanford did not accept the JDRF Award as it was granted—in a June 2024 email titled "JDRF Fellowship- Application Withdrawal Confirmation" Stanford's Fellowship Manager had told Dr. Laps: "Your Mentor, Danny Chou . . . *sent a request to remove himself as your*

*mentor on your previously submitted JDRF application* . . . and to have the application withdrawn if necessary as well." (*See* ¶136.) And then the Manager's boss volunteered that they "confirmed" that fact "with the department." (*See* ¶137.) This discrepancy was not discussed or, seemingly, reviewed.

174.    Mere days later, on or around March 10, 2025, the U.S. Department of Education would issue Stanford yet another letter noting that Jewish students faced "relentless antisemiti[sm]" and "warning [Stanford] of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus." Stanford stated to the press that the problem had been resolved by "a number of steps" and "clear policies." What steps and what policies, let alone adherence, Dr. Laps doesn't know.

**H.    CONSEQUENCES OF DR. CHOU AND STANFORD'S CONDUCT CONTINUE TO HARM DR. LAPS.**

175.    As he warned Stanford in his December 8, 2024 letter and several times before and after, Dr. Laps continues to suffer as a result of Stanford and Dr. Chou's willful conduct and being unlawfully forced off campus. The entire course of events has caused severe distress and anguish to Dr. Laps, which he continues to suffer.

176.    Dr. Chou's claims about a Title IX complaint against Dr. Laps created a whirlwind of rumor around Dr. Laps, the consequences of which were impossible to mitigate no matter what the Title IX office later clarified, to the detriment of Dr. Laps' career, reputation, professional standing, and day-to-day life.

177.    After being chased out of Stanford, Dr. Laps sought another institution to support his research. He has encountered a number of questions about why his time at the Chou Lab was so short, and even one response that the "smoke" indicated "fire." Many fellowships that he would have been able to obtain before he attended Stanford are no longer options, either because Dr. Laps is now too distant from his PhD to meet their requirements, or because he has "too much" experience for another research position.

178.    However, Dr. Laps was able to find an open position with another prestigious U.S. research university and peptide-oriented lab, even without the benefit of Stanford references and independent funding like the award he had won from JDRF.

FIRST AMENDED COMPLAINT

179. But Dr. Chou's immigration threats came true: because neither Dr. Chou nor Stanford would fulfill their original commitment to support Dr. Laps' three years of JDRF research, Dr. Laps was forced to leave the country.

180. Stanford did not at any time inform Dr. Laps that he would be unable to transfer his J-1 visa to another institution unless he did so while active at Stanford. Had Dr. Laps known, he would have found a means to protect himself from Stanford's discrimination and retaliation and transfer his visa to another institution.

181. Dr. Laps has since been advised by the U.S. Government that, because he already had a J-1 visa with Stanford that concluded, he is not eligible to transfer it to another institution or to conduct postdoctoral research at another university in the United States for at least 24 months. In other words, by the time Dr. Laps could gain lawful immigration status to conduct the postdoctoral work, it may be too late in his career to practically do it. And his opportunity to save his career from the damage Stanford had done may be gone.

182. None of this would have happened had Stanford and Dr. Chou simply addressed antisemitic and anti-Israeli bias when it came to their attention, rooted it out, and provided a non-discriminatory and non-retaliatory environment for Dr. Laps.

183. In addition, as a result of the hostile environment and Dr. Chou and Stanford's conduct, Dr. Laps was unable to publish any of the articles he intended to during his first year at the Chou Lab alone.

184. The only article for which Dr. Laps has completed sufficient research to seek publication alone involved the work of Dr. Chou and Dr. Lin. Though Dr. Chou had committed to supporting Dr. Laps' research for publication in the mediation with Gomperts, he has refused to assist Dr. Laps since and has, in fact, requested that Dr. Laps remove all attribution to Dr. Chou or the Chou Lab. Dr. Lin and Ms. Lin each requested that their attributions be removed as well. Publication is critical to any academic's career, and improves a scholar's reputation, standing, marketability, and value. Additionally, it is standard practice for an overseeing researcher like Dr. Chou, and particularly the academic responsible for a lab, to answer questions in response to the peer review process for such articles. These requests are supremely unorthodox, and Dr. Laps has never encountered academics who do not want credit on another author's

FIRST AMENDED COMPLAINT

research article, or lab heads who ask to omit their involvement. On information and belief, the requests are motivated by a desire to avoid association with an Israeli and Jewish academic and/or as further retaliation intended to harm Dr. Laps' career, and Dr. Chou's refusal to support or assist have severely—and foreseeably—foreclosed Dr. Laps' opportunities for publication.

185.    Dr. Laps' ability to publish even this one article is in serious question. Academic articles in chemistry are rigorously peer reviewed, and often come back with requests to re-perform or prove up aspects of the research—all of which can only be done with access to the original lab and materials. Dr. Laps is now cut off from these resources as a result of the hostile environment, discrimination, and retaliation he suffered.

186.    Dr. Laps, to this day, seeks only what he is due: to enforce his civil rights to nondiscriminatory treatment, to be free from retaliation for reporting a sincere belief that he suffered such treatment, and to change the world with his unique aptitude in chemistry. As a result of Stanford and Dr. Chou's insidious actions, it seems that there are no winners: everyone has lost.

187.    Plaintiff exhausted his administrative remedies prior to filing the instant action.

### FIRST CLAIM FOR RELIEF

**Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, et seq.) - Discrimination**

**(against Stanford)**

188.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

189.    Title VI of the Civil Rights Act of 1964 ("Title VI") provides, in relevant part: "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

190.    Title VI prohibits discrimination against Jews on the basis of race and prohibits discrimination against Israelis on the basis of national origin.

191.    Plaintiff is Jewish and of Israeli national origin, and his status as Jewish and Israeli brings him within Title VI's protections.

192. Title VI applies to all public and private educational institutions that receive federal funding.

193. Stanford is a private educational institution that receives millions of dollars in federal funding, including in the form of research grants.

194. Plaintiff participated in research activities at Stanford and benefitted from the use of federal funding.

195. Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

196. Plaintiff was injured as a result of Stanford's actions by the injection of bias into investigation of his complaints, losing financial support and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering distress that has diverted attention away from his employment and research, and by other harms that violate his rights.

197. Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

198. Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## SECOND CLAIM FOR RELIEF

### Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, et seq.) - Retaliation

### (against Stanford)

199. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

200. Title VI of the Civil Rights Act of 1964 ("Title VI") provides, in relevant part: "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

201.    Title VI prohibits discrimination against Jews on the basis of race and prohibits discrimination against Israelis on the basis of national origin.

202.    Plaintiff is Jewish and of Israeli national origin, and his status as Jewish and Israeli brings him within Title VI's protections.

203.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

204.    Plaintiff engaged in protected activity by filing a formal complaint of discrimination to notify Stanford he believed he was being discriminated against on the basis of his Jewish and Israeli identities.

205.    Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forced him to resign.

206.    These adverse actions were taken by Stanford in response to and in retaliation for Plaintiff's filing of a discrimination complaint.

207.    Plaintiff was injured as a result of Stanford's actions by losing financial support and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

FIRST AMENDED COMPLAINT

208.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

209.    Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## THIRD CLAIM FOR RELIEF

### Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, et seq.) – Discrimination

### (against Stanford)

210.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

211.    Title VII of the Civil Rights Act of 1964 ("Title VII") provides, in relevant part: "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e.

212.    Title VII prohibits discrimination against Jews on the basis of race and religion and prohibits discrimination against Israelis on the basis of national origin.

213.    Plaintiff is Jewish and of Israeli national origin, and his status as Jewish and Israeli brings him within Title VII's protections.

214.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

215.    Plaintiff was employed as a Postdoctoral Scholar by Stanford in its Department of Pediatrics, Division of Endocrinology and was considered an employee of Stanford. Plaintiff was exceptionally well-qualified for the position based on his academic and research qualifications. Plaintiff's performance as a Postdoctoral Scholar was at all times exemplary, as evidenced by the research milestones he achieved in the Chou Lab and the highly favorable recommendation he received.

FIRST AMENDED COMPLAINT

216. Plaintiff was similarly situated to other Postdoctoral Scholar employees at Stanford. All lab-based Postdoctoral Scholars at Stanford perform the same job responsibilities of research and scientific inquiry.

217. Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forced him to resign.

218. Stanford treated Plaintiff differently and less favorably than similarly situated non-Jewish and non-Israeli employees on account of his race, religion, and national origin. Upon information and belief, no other non-Jewish and non-Israeli Postdoctoral Scholar employees of the Chou Lab were denied access to the Chou Lab or research opportunities within the Chou Lab, no other non-Jewish and non-Israeli Postdoctoral Scholar employees were denied the benefits of grants they were awarded by Stanford, and no other non-Jewish and non-Israeli Postdoctoral Scholar employees had grant proposals withdrawn by Stanford.

219. Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

220. Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

221. Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

**FOURTH CLAIM FOR RELIEF**

**Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, et seq.) – Retaliation**

**(against Stanford)**

222. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

223. Title VII of the Civil Rights Act of 1964 ("Title VII") provides, in relevant part: "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e.

224. Title VII prohibits discrimination against Jews on the basis of race and religion and prohibits discrimination against Israelis on the basis of national origin.

225. Plaintiff is Jewish and of Israeli national origin, and his status as Jewish and Israeli brings him within Title VII's protections.

226. Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

227. Plaintiff was employed as a Postdoctoral Scholar by Stanford in its Department of Pediatrics, Division of Endocrinology. Plaintiff was exceptionally well-qualified for the position based on his academic and research qualifications. Plaintiff's performance as a Postdoctoral Scholar was at all times exemplary, as evidenced by the research milestones he achieved in the Chou Lab and the highly favorable recommendation he received.

228. Plaintiff engaged in multiple protected activities, including but not limited to filing a formal complaint of discrimination to notify Stanford he believed he was being discriminated against on the basis of his Jewish and Israeli identities.

229. Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford

57

FIRST AMENDED COMPLAINT

denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forcing him to resign.

230.    These adverse employments actions were taken by Stanford in response to and in retaliation for Plaintiff's filing of a discrimination complaint.

231.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

232.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

233.    Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

### FIFTH CLAIM FOR RELIEF

**Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981) – Discrimination**

**(against Stanford)**

234.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

235.    42 U.S.C § 1981 ("Section 1981") provides, in relevant part: "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as [] enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

236.    Section 1981 prohibits racial discrimination in contracting. In addition to race, Section 1981 prohibits discrimination based on "ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

237.    Section 1981 prohibits discrimination against Jews on the basis of race, ancestry, and ethnic characteristics.

238.    Plaintiff is Jewish and his status as Jewish brings him within Section 1981's protections.

239.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity. Stanford discriminated against Plaintiff and interfered with his ability to make and enforce his employment contract with Stanford and with his ability to "make and enforce" the JDRF grant and secure an additional JDRF grant because Plaintiff is Jewish.

240.    But for Plaintiff's Jewish identity, Stanford would not have discriminated against Plaintiff and interfered with his ability to make and enforce contracts. Plaintiff was employed as a Postdoctoral Scholar by Stanford in its Department of Pediatrics, Division of Endocrinology and was considered an employee of Stanford. Plaintiff was exceptionally well-qualified for the position based on his academic and research qualifications. Plaintiff's performance as a Postdoctoral Scholar was at all times exemplary, as evidenced by the research milestones he achieved in the Chou Lab and the highly favorable recommendation he received.

241.    Plaintiff was similarly situated to other Postdoctoral Scholar employees at Stanford. All lab-based Postdoctoral Scholars at Stanford perform the same job responsibilities of research and scientific inquiry.

242.    Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forced him to resign.

243.    Through these actions, Stanford interfered with Plaintiff's ability to perform under his employment contract with Stanford and interfered with his ability to enjoy the benefits, privileges, terms, and conditions of his employment. Stanford also interfered with Plaintiff's ability to perform under the terms of the JDRF grant and interfered with his ability to enjoy the benefits, privileges, terms, and

FIRST AMENDED COMPLAINT

conditions of the JDRF grant. Stanford also interfered with Plaintiff's ability to secure an additional JDRF grant by withdrawing the JDRF grant proposal.

244. Upon information and belief, no other non-Jewish Postdoctoral Scholar employees of the Chou Lab were denied access to the Chou Lab or research opportunities within the Chou Lab, no other non-Jewish Postdoctoral Scholar employees were denied the benefits of grants they were awarded by Stanford, and no other non-Jewish Postdoctoral Scholar employees had grant proposals withdrawn by Stanford.

245. Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

246. Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

247. Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## SIXTH CLAIM FOR RELIEF

### Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981) – Retaliation

### (against Stanford)

248. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

249. Section 1981 provides, in relevant part: "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as [] enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

FIRST AMENDED COMPLAINT

COHEN WILLIAMS LLP

250. Section 1981 prohibits racial discrimination in contracting. In addition to race, Section 1981 prohibits discrimination based on "ancestry or ethnic characteristics." *Saint Francis Coll.*, 481 U.S. at 613. Section 1981 additionally prohibits retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

251. Section 1981 prohibits discrimination against Jews on the basis of race, ancestry, and ethnic characteristics.

252. Plaintiff is Jewish and his status as Jewish brings him within Section 1981's protections.

253. Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity. Stanford discriminated against Plaintiff and interfered with his ability to make and enforce his employment contract with Stanford and with his ability to "make and enforce" the JDRF grant and secure an additional JDRF grant because Plaintiff is Jewish.

254. But for Plaintiff's Jewish identity, Stanford would not have discriminated against Plaintiff in interfered with his ability to "make and enforce contracts."

255. Plaintiff was employed as a Postdoctoral Scholar by Stanford in its Department of Pediatrics, Division of Endocrinology. Plaintiff was exceptionally well-qualified for the position based on his academic and research qualifications. Plaintiff's performance as a Postdoctoral Scholar was at all times exemplary, as evidenced by the research milestones he achieved in the Chou Lab and the highly favorable recommendation he received.

256. Plaintiff engaged in multiple protected activities, including but not limited to filing a formal complaint of discrimination to notify Stanford he believed he was being discriminated against on the basis of his Jewish identity.

257. Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forcing him to resign.

FIRST AMENDED COMPLAINT

258.   Through these actions, Stanford interfered with Plaintiff's ability to perform under his employment contract with Stanford and interfered with his ability to enjoy the benefits, privileges, terms, and conditions of his employment. Stanford also interfered with Plaintiff's ability to perform under the terms of the JDRF grant and interfered with his ability to enjoy the benefits, privileges, terms, and conditions of the JDRF grant. Stanford also interfered with Plaintiff's ability to secure an additional JDRF grant by withdrawing the JDRF grant proposal.

259.   These adverse employments actions were taken by Stanford in response to and in retaliation for Plaintiff's filing of a discrimination complaint.

260.   Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

261.   Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

262.   Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

### SEVENTH CLAIM FOR RELIEF

**Unruh Civil Rights Act (California) (Cal. Civ. Code § 51(b)) - Discrimination**

**(against Stanford)**

263.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

264.   California's Unruh Civil Rights Act ("Unruh Act") provides, in relevant part: "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their . . . race, color, religion, ancestry, national origin . . . citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Cal. Civ. Code § 51(b))

FIRST AMENDED COMPLAINT

265. The Unruh Act further provides, in relevant part: "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury. . . ." (Cal. Civ. Code § 52(a))

266. The Unruh Act prohibits discrimination against Jews on the basis of religion, race, and ancestry and prohibits discrimination against Israelis on the basis of national origin.

267. Stanford, a business establishment, denied Plaintiff, a student and patron, "full and equal accommodations, advantages, facilities, privileges, [and] services" under the meaning of the Unruh Act.

268. Stanford denied Plaintiff, whose research activities related to Stanford's commercial and business interests in developing potentially lucrative intellectual property and therapeutic interventions to treat diseases, "full and equal accommodations, advantages, facilities, privileges, [and] services" under the meaning of the Unruh Act.

269. Stanford denied Plaintiff equal treatment by subjecting Plaintiff to discrimination and harassment on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

270. Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

271. Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

272. Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

**EIGHTH CLAIM FOR RELIEF**

**California Fair Employment and Housing Act (Cal. Gov. Code § 12940(a)) – Discrimination**

**(against Stanford)**

273.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

274.    The California Fair Employment and Housing Act ("FEHA") provides, in relevant part: "[i]t is an unlawful employment practice . . . [f]or an employer, because of the race, religious creed, color, national origin, [or] ancestry . . . of any person . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov. Code § 12940(a).

275.    FEHA prohibits discrimination against Jews on the basis of religion, race, and ancestry, and prohibits discrimination against Israelis on the basis of national origin and ancestry.

276.    Plaintiff is Jewish and of Israeli national origin and ancestry, and his status as Jewish and Israeli brings him within FEHA's protections.

277.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

278.    Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forcing him to resign.

279.    These adverse employments actions were taken by Stanford in response to and in retaliation for Plaintiff's filing of a discrimination complaint.

280.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the

FIRST AMENDED COMPLAINT

United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

281.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

282.    Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

### NINTH CLAIM FOR RELIEF

**California Fair Employment and Housing Act (Cal. Gov. Code § 12940(j)(1)) – Harassment and**

**Hostile Work Environment**

**(against Stanford)**

283.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

284.    The California Fair Employment and Housing Act ("FEHA") provides, in relevant part: "[i]t is an unlawful employment practice . . . [f]or an employer, because of the race, religious creed, color, national origin, [or] ancestry . . . of any person . . . to harass an employee,…or a person providing services pursuant to a contract." Cal. Gov. Code § 12940(j)(1).

285.    The California Fair Employment and Housing Act ("FEHA") further provides that: "[h]arassment of an employee . . . shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." Cal. Gov. Code § 12940(j)(1).

286.    FEHA prohibits discrimination against Jews on the basis of religion, race, and ancestry, and prohibits discrimination against Israelis on the basis of national origin and ancestry.

287.    Plaintiff is Jewish and of Israeli national origin and ancestry, and his status as Jewish and Israeli brings him within FEHA's protections.

288.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is

FIRST AMENDED COMPLAINT

Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

289.    Plaintiff suffered severe and pervasive harassment by various Stanford colleagues, and most notably Ms. Lin, which included shunning him, speaking disparagingly to him on a regular basis when she was not ignoring him completely, nominating him for menial tasks disposing of the lab's trash and recruiting others in such conduct, and intentionally tampering with Plaintiff's assays to set him up for research fraud, which would have jeopardized his entire career if she had been successful. Plaintiff's supervisor, Dr. Chou, was aware of the harassment and took no steps to prevent it; instead ignoring Plaintiff's complaints before deciding to retaliate against him. Plaintiff also suffered severe and pervasive harassment at the hands of his supervisor, Dr. Chou, who not only condoned and ratified the harassment of Plaintiff's colleagues by failing to address it, affirmatively harassed Plaintiff by threatening him with false allegations of a Title IX complaint to pressure him to leave his position at Stanford. And in addition to Plaintiff's employment, Dr. Chou also threatened Plaintiff's immigration status. The harassment from Ms. Lin and Dr. Chou created an abusive working environment that any reasonable person in Plaintiff's position would find abusive, threatening, and ultimately, untenable.

290.    The harassing conduct by Stanford employees as described above was unwelcome and offensive to Plaintiff, and Plaintiff considered the conduct to be hostile, severe, and pervasive, and a significant interference with this ability to perform his job.

291.    Plaintiff is informed, believes, and based thereon alleges that a reasonable person in his circumstances would have considered the work environment to be hostile or abusive.

292.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

293.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

66

FIRST AMENDED COMPLAINT

294.    Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## TENTH CLAIM FOR RELIEF

### California Fair Employment and Housing Act (Cal. Gov. Code § 12940(h)) – Retaliation

### (against Stanford)

295.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

296.    FEHA provides, in relevant part: "[i]t is an unlawful employment practice . . . to . . . discriminate against any person because the person has opposed any practices forbidden under [FEHA]." Cal. Gov. Code § 12940(h).

297.    FEHA prohibits discrimination against Jews on the basis of religion, race, and ancestry, and prohibits discrimination against Israelis on the basis of national origin and ancestry.

298.    Plaintiff is Jewish and of Israeli national origin and ancestry, and his status as Jewish and Israeli brings him within FEHA's protections.

299.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

300.    Plaintiff engaged in protected activity by filing a formal complaint of discrimination to notify Stanford he believed he was being discriminated against on the basis of his Jewish and Israeli identities.

301.    Stanford took multiple adverse employment actions against Plaintiff including, but not limited to, condoning, permitting, and ratifying Dr. Chou's conduct prohibiting Plaintiff from performing his job duties by denying him full and equal access to the Chou Lab and denying him research opportunities within the Chou Lab. Plaintiff suffered further adverse employment action when Stanford denied him the full benefits of the JDRF grant he was awarded by reducing the time period of the grant from three years to one year, rendering the grant impossible to complete, and forcing him to resign.

302. These adverse employments actions were taken by Stanford in response to and in retaliation for Plaintiff's filing of a discrimination complaint.

303. Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

304. Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

305. Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## ELEVENTH CLAIM FOR RELIEF

**California Fair Employment and Housing Act (Cal. Gov. Code §§ 129409(k)) – Failure to Prevent**

**(against Stanford)**

306. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

307. The California Fair Employment and Housing Act ("FEHA") provides, in relevant part: "[i]t is an unlawful employment practice . . . [f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov. Code § 12940(k).

308. Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

309. Stanford failed to take any reasonable steps to prevent discrimination against Plaintiff. Dr. Chou condoned the discrimination Plaintiff was subjected to by Ms. Lin and Dr. Lin in the Chou Lab. Dr. Chou observed Ms. Lin and Dr. Lin's hostility towards Plaintiff for months and never did anything to address it. When Plaintiff informed Dr. Chou that Ms. Lin refused to assist him with ordering materials

and that she had intentionally tampered with his assays, Dr. Chou took no action other than encouraging Plaintiff to brush it off. Stanford condoned, permitted, and ratified this conduct by Dr. Chou, Ms. Lin, and Dr. Lin.

310.    Stanford also failed to take any reasonable steps to prevent discrimination or retaliation against Plaintiff. Indeed, after Plaintiff made a discrimination complaint, he was first informed that his discrimination claims would not be investigated because he was not a student. And even when Stanford agreed to investigate the discrimination claims, it dragged its feet and waited six weeks to open the investigation—during which time Plaintiff suffered additional discrimination. Stanford also declined to open an investigation into Plaintiff's claims of retaliation, allowing Dr. Chou to retaliate against Plaintiff for filing the discrimination complaint.

311.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

312.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

313.    Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

**TWELFTH CLAIM FOR RELIEF**

**Defamation**

**(against Dr. Chou)**

314.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

315.    Dr. Chou made oral and/or written statements to researchers, staff, and/or Dr. Laps' colleagues at Stanford claiming Dr. Laps was absent from the Chou Lab due to "legal licensing" issues with Dr. Laps' research.

316. These statements were false and defamatory.

317. The express and implied meaning of these statements was that Dr. Laps committed some type of intellectual property infringement and/or unlawfully utilized the property belonging to others without permission to do so. This express and implied meaning was apparent to reasonable observers and tended to injure Dr. Laps in respect to his position, profession, and business as an academic, scientific researcher, and chemist.

318. On information and belief, Dr. Chou also made oral and/or written statements to Stanford staff and administrators claiming that Dr. Laps had committed sexual harassment.

319. These statements were also false and defamatory.

320. The express and implied meaning of these statements was that Dr. Laps was responsible for harassing of young women. This express and implied meaning was apparent to reasonable observers and tended to injure Dr. Laps in respect to his position, profession, and business as an academic, scientific researcher, and chemist.

321. Dr. Chou made these statements and conveyed this express and implied meaning without any privilege and with actual malice. Dr. Chou knew that the cause of Dr. Laps' absence from the Chou Lab was a result of Dr. Chou's own actions, and specifically, rescinding Dr. Laps' access to the Chou Lab. Dr. Chou did not (and obviously could not) believe the truth of the statements and insinuations.

322. Dr. Chou also knew that the source of allegations against Dr. Laps was fabricated by individuals who did not claim to have been harassed. Dr. Chou did not (and obviously could not) believe the truth of the statements and insinuations.

323. Dr. Chou made these statements in an effort to destroy Dr. Laps' reputation and prior history as an outstanding and supremely ethical researcher, in the hopes of tarnishing Dr. Laps' credibility at Stanford while investigations into Dr. Laps' claims of discrimination and retaliation were ongoing so as to cover up wrongdoing occurring under Dr. Chou's supervision and at the Chou Lab, to incentivize Dr. Laps to flee Stanford so as to moot the ongoing investigation of wrongdoing occurring under Dr. Chou's supervision and at the Chou Lab, and to harm or destroy Dr. Laps' career in academia, scientific research, and chemistry.

FIRST AMENDED COMPLAINT

324. Dr. Chou expressly aimed and specifically directed his statements to Dr. Laps' peers and Stanford researchers and staff, where Dr. Chou knew his statements and insinuations would be most damaging to Dr. Laps.

325. On information and belief, the defamatory statements and insinuations of Dr. Chou were repeated in the Stanford and/or academic chemistry communities. Dr. Chou, as originator of these false statements and insinuations, is liable for each republication of the defamatory matters.

326. In making the defamatory statements, Dr. Chou's conduct described above was willful, malicious, fraudulent, and in conscious disregard of Dr. Laps' rights, warranting an award of punitive damages.

327. Plaintiff was injured as a result of Dr. Chou's actions by the injection of bias and false information into the investigations of his complaints, losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

328. Plaintiff has suffered harm as a direct and proximate result Dr. Chou's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

329. Absent injunctive and declaratory relief against Defendants, Plaintiff will continue to be harmed as a result of Dr. Chou's actions.

## THIRTEENTH CLAIM FOR RELIEF

**Unfair Competition Law (California) (Cal. Bus. & Prof. Code § 17200, et seq.) – Unlawful**

**Business Practice**

**(against Stanford)**

330. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

71

FIRST AMENDED COMPLAINT

331.    California Business & Professions Code § 17200, et seq. (California's "Unfair Competition Law" or "UCL"), prohibits "unfair competition," which includes any "unlawful, unfair, or fraudulent business act."

332.    The UCL confers standing upon private individuals who have "suffered injury in fact and ha[ve] lost money or property as a result of [] unfair competition." Cal. Bus. & Prof. Code § 17204.

333.    As alleged herein, Stanford has violated the "unlawful" prong of the UCL's "unfair competition" standard, including by discriminating against and harassing Plaintiff on the basis of his Jewish and Israeli identities and retaliating against Plaintiff in violation of Title VI, Title VII, the Unruh Act, and FEHA.

334.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

335.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest. Plaintiff lost money as a direct and proximate result of Stanford's unlawful conduct due to his loss of employment and related moving and travel expenses.

336.    Plaintiff lacks an adequate remedy at law and endeavors to seek future employment and research opportunities in the same university community as Stanford, and is directly harmed by Stanford's continuing unlawful and unfair business acts or practices.

337.    Stanford's harassment and discrimination on the basis of Jewish and/or Israeli identity characteristics harms the general public by normalizing these unlawful practices, and the unlawful practices of discrimination and harassment generally, as fully set forth above.

338.    Plaintiff seeks public injunctive relief under the UCL enjoining Stanford from further engaging in discrimination and harassment on Jewish and/or Israeli identity, and from engaging in retaliation, in the future and for the benefit of the general public.

72

FIRST AMENDED COMPLAINT

## FOURTEENTH CAUSE OF ACTION

### California Education Code (Cal. Educ. Code § 66270) – Discrimination

### (against Stanford)

339.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

340.    The California Education Code provides, in relevant part: "[n]o person shall be subjected to discrimination on the basis of . . . nationality, race or ethnicity, [or] religion . . . in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid." Cal. Educ. Code § 66270.

341.    The California Education Code prohibits discrimination against Jews on the basis of race, ethnicity and religion and prohibits discrimination against Israelis on the basis of nationality.

342.    Plaintiff is Jewish and of Israeli national origin, and his status as Jewish and Israeli brings him within the California Education Code's protections.

343.    The California Education Code applies to all public and private postsecondary educational institutions that receive funding from the State of California.

344.    Stanford is a private postsecondary educational institution that receives millions of dollars in state funding.

345.    Plaintiff was subjected to discrimination and harassment by Stanford on the basis of his Jewish identity and Israeli national origin. Plaintiff was treated differently by Stanford because he is Jewish and Israeli. By its actions, Stanford intended to treat Plaintiff differently based on his Jewish and Israeli identities as compared to similarly situated non-Jewish and non-Israeli persons.

346.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

FIRST AMENDED COMPLAINT

347.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

348.    Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## FIFTEENTH CLAIM FOR RELIEF

### California Labor Code (Cal. Lab. Code §§ 201, 203, 558.1) – Failure to Pay All Wages Owed on Termination of Employment

### (against Stanford)

349.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

350.    Until February 26, 2025, Plaintiff was employed as a Postdoctoral Scholar by Stanford in its Department of Pediatrics, Division of Endocrinology within the meaning of California Labor Code section 558.1(b).

351.    At the time Plaintiff was forced to resign, Dr. Laps had earned, but not been paid, for vacation time during 2024 and 2025. These amounts were due and payable to Plaintiff immediately upon discharge, pursuant to California Labor Code Section 201(a).

352.    Stanford's failure to pay these amounts was willful and has continued, entitling Dr. Laps to penalties under California Labor Code section 203.

## SIXTEENTH CLAIM FOR RELIEF

### Constructive Discharge in Violation of Public Policy

### (against Stanford)

353.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth herein.

354.    Plaintiff suffered continuous discrimination, harassment, and retaliation at the hands of various Stanford colleagues, including Ms. Lin, Dr. Lin, and Dr. Chou. The harassment included Ms. Lin shunning him, speaking disparagingly to him on a regular basis when she was not ignoring him completely, nominating him for menial tasks disposing of the lab's trash and recruiting others in such

FIRST AMENDED COMPLAINT

conduct, and intentionally tampering with Plaintiff's assays to set him up for research fraud, which would have jeopardized his entire career if she had been successful. Plaintiff's supervisor, Dr. Chou, harassed Plaintiff by threatening him with false allegations of a Title IX complaint to pressure him to leave his position at Stanford, and also threatened Plaintiff's immigration status. When Plaintiff complained about these matters, Stanford and Dr. Chou retaliated against him by, among other conduct, withdrawing their support for a three-year JDRF grant, reducing the purported support to one year (which Dr. Chou and Stanford knew were tantamount to terminating Plaintiff's ability to conduct the funded research) and then terminating all support for the grant after Plaintiff continued to protest Stanford's illegal conduct.

355.    It is the public policy of the State of California, as set forth in the Unruh Act, FEHA, the UCL, the California Education Code, and the California Labor Code, that all persons should be free from discrimination, harassment, and retaliation for reporting unlawful conduct in the course of their employment.

356.    Stanford knowingly permitted these intolerable and aggravated working conditions. Stanford was aware of each and every instance of harassment of Plaintiff, which Plaintiff reported multiple times to Dr. Chou and Stanford administrators, but allowed the intolerable and aggravated working conditions to persist and exacerbated those conditions by retaliating against Plaintiff when he engaged in protected activities to seek redress from Stanford.

357.    The discrimination, harassment, and retaliation against Plaintiff created intolerable and aggravated working conditions that would have compelled any reasonable person in Plaintiff's position to resign and amounted to a constructive discharge in violation of public policy of the State of California.

358.    Plaintiff was injured as a result of Stanford's actions by losing employment, learning, and research opportunities necessary for his career advancement, suffering harm to his reputation and his ability to secure alternative employment, suffering harm to his immigration status as a visa holder in the United States, suffering emotional and physical stress that has diverted attention away from his employment and research, and by other harms that violate his rights.

359.    Plaintiff has suffered harm as a direct and proximate result of Stanford's actions in the form of general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

75

FIRST AMENDED COMPLAINT

360. Absent injunctive and declaratory relief against Stanford, Plaintiff will continue to be harmed as a result of Stanford's actions.

## SEVENTEENTH CLAIM FOR RELIEF

### Breach of Implied Contract

### (against Stanford)

361. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth herein.

362. Under California law, a contract may be express or implied. An implied contract can be created through conduct, the relationship of the parties, and surrounding circumstances, with or without spoken or written words. Contracts created by conduct are just as enforceable as contracts formed with words.

363. Dr. Chou stated orally and wrote to Dr. Laps on multiple occasions to promise that he and the Chou Lab would employ Dr. Laps and support his work for multiple years, beyond the 2024-2025 school year. These instances included, but were not limited to, oral communications during interviews before Dr. Laps joined the Lab, again during preliminary examination procedures, in the course of completing and in submitting the JDRF Proposal, oral communications during a July 24, 2024 Individual Development Plan meeting, and in emails and conversations throughout their contact with one another. In addition, Dr. Chou's conduct at all times prior to Dr. Laps' Discrimination Complaints evidenced a promised to support Dr. Laps' work for multiple years, and at least through 2028. Stanford affirmed and ratified these representations.

364. Stanford also promised on multiple occasions to employ Dr. Laps and support his work for multiple years, beyond the 2024-2025 school year. These instances included but were not limited to emails and oral communications in the course of reviewing, approving, and submitting the JDRF Proposal.

365. Stanford knew, or had reason to know, that Dr. Laps would interpret the aforementioned conduct as an offer and agreement to enter into a contract.

366. Dr. Laps accepted these offers to enter into an implied contract and all times agreed to complete research at Stanford and in the Chou Lab, including the JDRF research, through at least 2028. At all relevant times, Dr. Laps did all, or substantially all, of the significant things required for him to

FIRST AMENDED COMPLAINT

perform his research at the Chou Lab, and demonstrated his intention to do so indefinitely into the future. Thus, Dr. Laps entered into an implied contract with Stanford.

367.    Stanford breached this implied contract in by allowing Dr. Chou to lock Dr. Laps out of the Chou Lab and purport to fire Dr. Laps, rescinding their agreement to support Dr. Laps' ongoing research in the Chou Lab, rescinding their agreement to host and support Dr. Laps' research under the JDRF grant as awarded, refusing to find another suitable Stanford lab to host Dr. Laps' research at least through 2028, and in ending Dr. Laps' postdoctoral appointment as of March 31, 2025. These breaches were a substantial factor in causing harm to Dr. Laps, including to his reputation.

368.    Dr. Laps has suffered harm as a direct and proximate result of Dr. Chou and Stanford's actions and breaches of the implied contract between them in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court:

- Declare that Stanford has violated Titles VI and VII of the Civil Rights Act of 1964, the Unruh Civil Rights Act (California), the California Fair Employment and Housing Act, California's Unfair Competition Law, the California Education Code, and the California Labor Code, and breached an implied contract with Dr. Laps;

- Declare that Dr. Chou has defamed Dr. Laps;

- Issue a public injunction enjoining Stanford from engaging in future discrimination, harassment, and retaliation based on Jewish and/or Israeli identity;

- Award Plaintiff economic, non-economic, and compensatory damages, including all past lost earnings (through the date of trial) and all future lost earnings (after trial);

- Award Plaintiff compensation for all unpaid wages owed upon conclusion of his employment and statutory waiting time penalties for nonpayment of earned wages;

- Award Plaintiff punitive damages;

- Award Plaintiff pre-judgment and post-judgment interest for his loss of rights under federal and state law;

FIRST AMENDED COMPLAINT

- Award Plaintiff the costs of this action, costs incurred in mitigating his damages, and reasonable attorneys' fees; and

- Award such other and further relief to which Plaintiff may be entitled or the Court deems just and proper.

## JURY DEMAND

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues triable by a jury.

Dated: January 22, 2026

By: _____

Reuven L. Cohen (CA Bar No. 231915)
Email: rcohen@cohen-williams.com
Kathleen M. Erskine (Bar No. 223218)
Email: kerskine@cohen-williams.com
Talia Nissimyan (CA Bar No. 307576)
Email: tnissimyan@cohen-williams.com
Michael J. Fisher (CA Bar No. 354524)
Email: mfisher@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Tel: 213-232-5162

Alyza D. Lewin (*admitted pro hac vice*)
Email: alewin@brandeiscenter.com
L. Rachel Lerman (CA Bar No. 193080)
Email: rlerman@brandeiscenter.com
David M. Dince (*admitted pro hac vice*)
Email:ddince@brandeiscenter.com
THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW
1717 Pennsylvania Avenue NW, Ste. 1025
Washington, DC 20006
Telephone: 202-559-9296

*Attorneys for Plaintiff Dr. Shay Laps*

COHEN WILLIAMS LLP

FIRST AMENDED COMPLAINT